# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: PURDUE PHARMA L.P., *et al.* BANKRUPTCY APPEALS | 21 cv 7532 (CM) |
| | 21 cv 7585 (CM) |
| | 21 cv 7961 (CM) |
| | 21 cv 7962 (CM) |
| This Filing Relates to | 21 cv 7966 (CM) |
| | 21 cv 7969 (CM) |
| | 21 cv 8034 (CM) |
| ALL MATTERS | 21 cv 8042 (CM) |
| | 21 cv 8049 (CM) |
| | 21 cv 8055 (CM) |
| | 21 cv 8139 (CM) |
| | 21 cv 8258 (CM) |
| | 21 cv 8271 (CM) |
| | 21 cv 8548 (CM) |
| | 21 cv 8557 (CM) |
| | 21 cv 8566 (CM) |

On Appeal from the United States Bankruptcy Court for the Southern District of New York (Drain, J.)

---

# BRIEF OF APPELLEE THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF PURDUE PHARMA L.P., *ET AL.*

AKIN GUMP STRAUSS
HAUER & FELD LLP
One Bryant Park
New York, N.Y. 10036-6745
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

2001 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 887-4000
Facsimile: (202) 887-4288

*Counsel for the Official Committee of Unsecured Creditors of Purdue Pharma L.P., et al.*

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

ARGUMENT ........................................................................................................5

I.   THIS COURT SHOULD AFFIRM THE APPROVAL OF THE NON-DEBTOR
     RELEASE IN THE UNPRECEDENTED CIRCUMSTANCES OF THESE
     CHAPTER 11 CASES ..................................................................................5

     A.   The Release Falls Comfortably Within The Rule Under *Metromedia* And
          Other Second Circuit Authorities That Bankruptcy Courts May Approve
          Non-Debtor Releases That Are Important To A Debtor's Reorganization...............5
          1.   *These Chapter 11 Cases are unmistakably "unique" within the
               meaning of* Metromedia. ...........................................................7
          2.   *The Release provides and protects substantial consideration that is
               central to the Plan and its success.*...........................................15
          3.   *Appellants all but concede* Metromedia *is satisfied.* ....................18

     B.   *Metromedia* And The Second Circuit's Extensive Non-Debtor Release
          Cases Were Not "Wrongly Decided," As Appellants Contend............................22
          1.   *The Bankruptcy Code authorizes non-debtor releases.* .....................23
          2.   *None of the Bankruptcy Code provisions cited by Appellants limits
               a bankruptcy court's power to release third-party claims.*.................26
          3.   *The Bankruptcy Code includes no "police power exception" to  a
               bankruptcy court's power to grant non-debtor releases.*....................29
          4.   *No constitutional principle or provision bars non-debtor releases,
               including of police power claims.* ............................................34

     C.   The Bankruptcy Court Has Statutory Jurisdiction And Constitutional
          Adjudicatory Authority To Approve The Release As Part Of Confirmation .........37
          1.   *The third-party claims directly affect the* res *of the estate and
               therefore have the conceivable effect necessary to establish section
               1334 jurisdiction.* ...............................................................37
          2.   *The exercise of jurisdiction was both statutorily and
               constitutionally "core."* ......................................................42

     D.   The Bankruptcy Court's Finding That Due Process Was Afforded To Third
          Parties Is Not Clearly Erroneous.................................................44

II.  THE PLAN IS IN THE BEST INTERESTS OF CREDITORS REGARDLESS
     OF THE LEGAL TEST APPLIED .......................................................49

CONCLUSION....................................................................................................55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abel v. Shugrue (In re Ionosphere Clubs, Inc.)*,
    184 B.R. 648 (S.D.N.Y. 1995)................................................................................33

*Airadigm Commc'ns, Inc. v. FCC (In re Airadigm Commc'ns, Inc.)*,
    519 F.3d 640 (7th Cir. 2009) ...................................................................23, 25, 28

*Anderson v. City of Bessemer City*,
    470 U.S. 564 (1985).............................................................................................7

*Bank of N.Y. Tr. Co., N.A. v. Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*,
    584 F.3d 229 (5th Cir. 2009) .................................................................................27

*Browning v. Navarro*,
    743, F.2d 1069 (5th Cir. 1984) .............................................................................32

*Cartalemi v. Karta Corp. (In re Karta Corp.)*,
    342 B.R. 45 (S.D.N.Y. 2006)..................................................................................6

*Celotex Corp. v. Edwards*,
    514 U.S. 300 (1995)............................................................................................37

*Central Virginia Community College v. Katz*,
    546 U.S. 356 (2006) ...............................................................................34, 35, 36

*In re Charter Commc'ns*,
    No. 09-11435 JMP, 2010 WL 502764 (Bankr. S.D.N.Y. Feb. 8, 2010) ................................33

*Cisneros v. Alpine Ridge Grp.*,
    508 U.S. 10 (1993)..............................................................................................33

*Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*,
    280 F.3d 648 (6th Cir. 2002) ...................................................................24, 25, 28

*In re Commonwealth Cos.*,
    913 F.2d 518 (8th Cir. 1990) .................................................................................32

*In re Cont'l Airlines*,
    203 F.3d 203 (3d Cir. 2000)............................................................................27, 28

*In re Cuyahoga Equip. Corp.*,
    980 F.2d 110 (2d Cir. 1992)..................................................................................37

*Czyzewski v. Jevic Holding Corp.*,
    137 S. Ct. 973 (2017)....................................................................................................29

*Davila v. Peralta (In re Peralta)*,
    No. 16-21251 (RG), 2019 WL 6048531 (Bankr. D.N.J. Nov. 14, 2019) ................................28

*Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc. (In re*
    *Metromedia Fiber Network, Inc.)*,
    416 F.3d 136 (2d Cir. 2005)...................................................................... *passim*

*In re Ditech Holding Corp.*,
    606 B.R. 544 (Bankr. S.D.N.Y. 2019) ....................................................................54

*In re Dow Corning Corp.*,
    86 F.3d 482 (6th Cir. 1996) ...................................................................................40

*In re Drexel Burnham Lambert Grp., Inc.*,
    960 F.2d 285 (2d Cir. 1992).............................................................................5, 22

*Dunaway v. Purdue Pharms. L.P. (In re Purdue Pharms. L.P.)*,
    619 B.R. 38 (S.D.N.Y. 2020)..................................................................30, 31, 40

*Elliott v. GM LLC (In re Motors Liquidation Co.)*,
    829 F.3d 135 (2d Cir. 2016)..................................................................................44

*In re F. Grp., Inc.*,
    82 F.3d 159 (7th Cir. 1996) ..................................................................................33

*FCC v. NextWave Pers. Commc'ns, Inc.*,
    537 U.S. 293 (2003)...............................................................................................30

*In re Fed.-Mogul Glob. Inc.*,
    684 F.3d 355 (3d Cir. 2012)..................................................................33, 34, 36

*Fisher v. Apostolou (In re Lake States Commodities, Inc.)*,
    155 F.3d 876 (7th Cir. 1998) ................................................................................53

*Geier v. Am. Honda Motor Co.*,
    529 U.S. 861 (2000)...............................................................................................44

*Irving Tanning Co. v. Me. Superintendent of Ins. (In re Irving Tanning Co.)*,
    496 B.R. 644 (B.A.P. 1st Cir. 2013) .....................................................................34

*Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.)*,
    600 F.3d 135 (2d Cir. 2010)..................................................................................49

*Kane v. Johns-Manville Corp.*,
    843 F.2d 636 (2d Cir. 1988)..................................................................................49

*Law v. Siegel*,
    571 U.S. 415 (2014)......................................................................................28

*Lynch v. Lapidem Ltd. (In re Kirwan Offices S.A.R.L.)*,
    592 B.R. 489 (S.D.N.Y. 2018)..................................................25, 36, 42, 43, 44

*MacArthur Co. v. Johns-Manville Corp.*,
    837 F.2d 89 (2d Cir. 1988)...........................................................................23

*In re Mal Dunn Assocs., Inc.*,
    406 B.R. 622 (Bankr. S.D.N.Y. 2009) ............................................................6

*Martin v. Wilks*,
    490 U.S. 755 (1989)......................................................................................48

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996)......................................................................................34

*Meksavanh v. Senouthai (In re Senouthai)*,
    No. AP 15-00425-MDC, 2019 WL 1400090 (Bankr. E.D. Pa. Mar. 26, 2019) .....................28

*In re Millennium Lab Holdings II, LLC*,
    945 F.3d 126 (3d Cir. 2019), *cert. denied sub nom. ISL Loan Tr. v.*
    *Millennium Lab Holdings II, LLC*, 140 S. Ct. 2805 (2020)................................6, 22

*Montgomery Cty., Md. v. Barwood, Inc.*,
    422 B.R. 40 (D. Md. 2009) ...........................................................................34

*Motorola, Inc. v. Official Committee of Unsecured Creditors (In re Iridium*
    *Operating LLC)*,
    478 F.3d 452 (2d Cir. 2007)..........................................................................52

*Mullane v. Cent. Hanover Bank & Trust Co.*,
    330 U.S. 306 (1950)......................................................................................47

*Nat'l Heritage Found., Inc. v. Highbourne Found.*,
    760 F.3d 344 (4th Cir. 2014), *cert. denied*, 135 S. Ct. 961 (2015)......................6, 22

*In re Neuman*,
    71 B.R. 567 (S.D.N.Y. 1987).........................................................................32

*New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy*
    *Mart Convenience Stores, Inc.)*,
    351 F.3d 86 (2d Cir. 2003)............................................................................25

*O'Rourke v. United States*,
    587 F.3d 537 (2d Cir. 2009)..........................................................................51

*Ortiz v. Fibreboard Corp.*,
  527 U.S. 815 (1999)..................................................................................48

*Pa. Dep't of Pub. Welfare v. Davenport*,
  495 U.S. 552 (1990)..................................................................31, 34, 35

*Pacific Gas & Elec. Co. v. California ex rel. California Department of Toxic
  Substances Control*,
  350 F.3d 932 (9th Cir. 2003) ...................................................................34

*Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.*,
  639 F.3d 572 (2d Cir. 2011)......................................................................37

*Patrick v. Success Acad. Charter Schs., Inc.*,
  354 F. Supp. 3d 185 (S.D.N.Y. 2018).......................................................48

*Penn Terra Ltd. v. Dep't of Env't Res., Com. of Pa.*,
  733 F.2d 267 (3d Cir. 1984)......................................................................32

*Perez v. Campbell*,
  402 U.S. 637 (1971)..................................................................................35

*Picard v. Fairfield Greenwich Ltd.*,
  762 F.3d 199 (2d Cir. 2014)................................................................23, 32

*Printz* v. *United States*,
  521 U.S. 898 (1997)..................................................................................35

*In re Quigley Co.*,
  437 B.R. 102 (Bankr. S.D.N.Y. 2010) ......................................................54

*In re Quigley Co.*,
  676 F.3d 45 (2d Cir. 2012)..............................................37, 38, 39, 40, 41

*Richards v. Jefferson Cty.*,
  517 U.S. 793 (1996)..................................................................................48

*Savage Assocs., P.C. v. Williams Commc'ns (In re Teligent Servs., Inc.)*,
  372 B.R. 594 (S.D.N.Y. 2007).....................................................................7

*SE Prop. Holdings, LLC v. Seaside Eng'g & Surveying (In re Seaside Eng'g &
  Surveying, Inc.)*,
  780 F.3d 1070 (11th Cir. 2015), *cert. denied sub nom. Vision-Park Props. v.
  Seaside Eng'g & Surveying*, 577 U.S. 823 (2015)............................22, 28

*In re Specialty Equip. Cos.*,
  3 F.3d 1043 (7th Cir. 1993) ...........................................................25, 27, 28

*SPV Osus Ltd. v. UBS AG*,
   882 F.3d 333 (2d Cir. 2018).............................................................................37, 40

*Stern v. Marshall*,
   564 U.S. 462 (2011).................................................................................................42

*In re Taddeo*,
   685 F.2d 24 (2d Cir. 1982).....................................................................................34

*Taylor v. Sturgell*,
   553 U.S. 880 (2008).................................................................................................48

*Tenn. Student Assistance Corp. v. Hood*,
   541 U.S. 440 (2004).................................................................................................30

*United States v. Energy Resources Co.*,
   495 U.S. 545 (1990) ..........................................................................................24, 32

*Van Huffel v. Harkelrode*,
   284 U.S. 225 (1931).................................................................................................31

*Weinstein v. Islamic Rep. of Iran*,
   609 F.3d 43 (2d Cir. 2010)......................................................................................33

*Winstar Holdings, LLC v. Blackstone Grp. L.P.*,
   No. 07-cv-4634, 2007 WL 4323003 (S.D.N.Y. Dec. 10, 2007) .............................39

**Statutes**

11 U.S.C. § 101(15) ......................................................................................................35

11 U.S.C. § 105(a) ................................................................................................ *passim*

11 U.S.C. § 523(a) ...........................................................................................28, 32, 54

11 U.S.C. § 524(a) ........................................................................................................27

11 U.S.C. § 524(e) ...................................................................................................27, 28

11 U.S.C. § 524(g) ..................................................................................................26, 35

11 U.S.C. § 525 .............................................................................................................35

11 U.S.C. § 1123(a)(5).................................................................................................33

11 U.S.C. § 1123(b)(6) ...........................................................................................23, 24

11 U.S.C. § 1141(d) ................................................................................................27, 28

11 U.S.C. § 1334(a)-(b) ................................................................................37

28 U.S.C. § 157(b) .............................................................................2, 42, 43

108 Stat. 4117 (1994).................................................................................26

**Other Authorities**

140 Cong. Rec. H10,765 (Oct. 4, 1994) ......................................................26

140 Cong. Rec. S14,461 (daily ed. Oct. 6, 1994) ........................................26

2 COLLIER ON BANKRUPTCY ¶ 105.04.........................................................26

H.R. Rep. No. 103-834 (1995)....................................................................26

H.R. Rep. No. 95-595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963 ...........32

Joshua M. Silverstein, *Hiding in Plain View: A Neglected Supreme Court
    Decision Resolves the Debate over Non-Debtor Releases in Chapter 11
    Reorganizations*, 23 EMORY BANKR. DEV. J. 13 (2006) .........................25

S. Rep. No. 95-989 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787................32

U.S. Const. amend. V...................................................................................48

U.S. Const. art. I, § 8, cl. 4.........................................................................23

## INTRODUCTION

The plan of reorganization (the "Plan") at issue on appeal is the creditors' Plan.  It followed an investigation of Purdue Pharma, L.P. ("Purdue" or the "Debtors") and members of and entities related to the Sackler family ("Sacklers") by the Official Committee of Unsecured Creditors (the "Official Committee"), states, and other creditor groups, which the Bankruptcy Court remarked was the most extensive it had ever seen.  The Plan required years of negotiations among creditors, including multiple mediations before three of the most skilled mediators in the country, and a complex, interlocking series of compromises amongst *ad hoc* groups of differently situated opioid claimants, plus the negotiation by creditors of a multi-billion dollar cash settlement with the Sacklers.  Without that Sackler contribution, and the release of third-party claims necessary to obtain the Sacklers' agreement (the "Release"), it is undisputed that the Plan would unravel, and along with it, the chance to provide billions of dollars to abate the opioid crisis and provide compensation to victims, *now*, when that funding is desperately needed.

Unsurprisingly, since the Plan largely was crafted by creditors, it enjoys their overwhelming support.  More than 95% of creditors voting supported the Plan, including the overwhelming majority of states, and representatives of virtually all local governmental subdivisions and Native American Tribes.  Indeed, of the hundreds of thousands of creditors filing proofs of claim in Purdue—another record—just a dozen or so parties to the chapter 11 proceedings below (the "Chapter 11 Cases") appeal the Bankruptcy Court's order confirming the Plan (the "Confirmation Order"):  the U.S. Trustee, which is not even a creditor with an actual stake in the Plan; the Attorneys General from Connecticut, Delaware, the District of Columbia, Maryland, Oregon, Rhode Island, Vermont, and Washington; representatives of Canadian municipalities and First Nations creditors; and three *pro se* individuals (collectively, "Appellants").

Appellants argue that the Release on which the Plan depends is not authorized by the Bankruptcy Code, exceeds the Bankruptcy Court's statutory and Article III jurisdiction, and is otherwise constitutionally unsound, and therefore the Confirmation Order must be reversed. But as the Bankruptcy Court explained in its detailed Confirmation Order and Bench Ruling, these Chapter 11 Cases present exactly the sort of unique circumstances that justify non-consensual third-party releases under sections 105(a) and 1123(b)(6) of the Bankruptcy Code, as confirmed by Second Circuit precedents dating back more than 30 years. Indeed, because the Second Circuit unmistakably authorized non-debtor releases in bankruptcy plans in *In re Metromedia Fiber Network, Inc.* and numerous other decisions, Appellants are largely constrained to arguing that all of those cases simply "were wrongly decided." Of course, Appellants cannot prevail by second-guessing the Second Circuit's well-reasoned, and binding, precedents.

Placing these cases squarely within its statutory and constitutional jurisdiction, the Bankruptcy Court was careful to cabin the scope of the Release only to claims with a direct impact on the *res* of the bankruptcy estates, and to make only current and future holders of claims against the Debtors subject to the Release. The Bankruptcy Court did not adjudicate any claims subject to the Release, instead exercising its core authority to confirm the Plan under 28 U.S.C. § 157(b)(2)(L). The Appellants' due process arguments are likewise misguided, as is evident from the extensive record below concerning the extraordinary notice provided to creditors in these cases concerning the Plan and Release.

In short, Appellants' challenges to the Release fail across the board. And that is fortunate for the tens of thousands of communities and hundreds of thousands of victims around the country who stand to receive desperately needed aid under the Plan. Appellants admit that without the Release, the Plan would unravel. Appellants say they favor this outcome because they would

2

rather return to the litigation free-for-all that prevailed before these Chapter 11 Cases were filed, in the vain hope that they might, someday, recover from the Sacklers more for themselves than is contemplated under the Plan.  As the Bankruptcy Court expressly held based on the record below, however, in a chapter 7 liquidation scenario, Appellants would be likely to receive far *less* than they are allocated under the Plan, and the Plan therefore also satisfies the "best interests of creditors" test under section 1129(a)(7) of the Bankruptcy Code.  That is true not only because of the cost, delay, and uncertainty that would be associated with a return to litigation against the Sacklers, but also because plaintiffs would be in competition with the estates and thousands of other opioid plaintiffs who asserted, or may assert, claims against the Sacklers.

In advocating for this doomsday scenario, Appellants claim to speak for all of the people and entities that they represent (*i.e.*, entire state populations or the public at large).  This assertion is difficult to reconcile with the overwhelming support for the Plan by every category of Purdue's creditors.  For its part, the Official Committee is the fiduciary for *all* of Purdue's creditors, public and private, with eight dedicated members, including individuals who are themselves victims of the opioid epidemic, representatives of a trade association for 35 independent health insurance companies collectively insuring 110 million members, the Pension Benefit Guarantee Corporation (the federal entity responsible for insuring defined benefit pension plans), a co-defendant in opioid litigation that has asserted indemnification claims against the Debtors, and three *ex officio* members that represent political subdivisions, tribes, and public school districts.

The Official Committee led the extraordinarily thorough investigation of claims against the Sacklers lauded by the Bankruptcy Court, and arguably is more familiar with the strengths and weaknesses of those claims than any party in interest in these cases.  To be sure, the Official Committee believes it is possible that a scorched-earth, take-no-prisoners litigation against the

Sacklers might well lead to judgments against them in excess of the $4.325 billion they have agreed to pay under the Plan.  However, there can be no guarantees, and such litigation would likely take years, would encounter significant legal and factual obstacles, and, if successful, would require collection of the resulting judgment(s) from spendthrift trusts, many of which are located overseas. In light of those unavoidable circumstances, the Official Committee, and virtually all of Purdue's creditors, made the reasoned judgment to support a Plan that will deliver relief to creditors and communities promptly and with certainty.  These creditors recognized, as the Bankruptcy Court recently found, that every day that goes by without the Plan being implemented will likely result in additional unnecessary death and suffering as a result of the opioid epidemic.

The Release, which the Official Committee was heavily involved in negotiating, and which the Bankruptcy Court further narrowed and refined, is essential to the success of the Plan.  As the Sacklers testified at the hearing below, and as is self-evident in any case, they would not have agreed to pay $4.325 billion to the estates without getting the Release in exchange.  Likewise, creditors would have been foolish to support the Plan absent a Release that constrains *everyone* from continuing litigation against the Sacklers.  Absent the bar of the Release, exempt creditors could use their monopoly on litigation leverage to unfairly extract disproportionate value from the Sacklers, and could even threaten the Sacklers' ability to satisfy their payment commitments under the Plan, which are scheduled to continue for up to nine years.

In light of the importance of the Release to the Plan, the unique circumstances of these cases, and the Bankruptcy Court's fastidious care in limiting its scope, the Release readily passes muster under established Second Circuit law.  The Official Committee respectfully submits that the Confirmation Order should be affirmed.

**ARGUMENT**

## I.   THIS COURT SHOULD AFFIRM THE APPROVAL OF THE NON-DEBTOR RELEASE IN THE UNPRECEDENTED CIRCUMSTANCES OF THESE CHAPTER 11 CASES

As this Court recognized at the initial hearing on these appeals, "the core issue here is the Sackler release issue" and whether the Release "is constitutional, whether [it] is statutorily authorized." Oct. 12, 2021 Hr'g Tr. at 8:6-9:14 (S.D.N.Y.). The answer to those questions is a resounding "yes." The Release is clearly consistent with Second Circuit case law recognizing the power of bankruptcy courts to approve third-party releases, and those extensive, binding precedents were not "wrongly decided" as Appellants contend. UST Br. 57; *see, e.g.*, Cal. Br. 7. Indeed, sections 105(a) and 1123(b)(6) of the Bankruptcy Code provide ample authority for such releases, and neither the Code nor the Constitution provides any exception for claims involving the alleged exercise of "police powers" by states. Finally, the Bankruptcy Court's jurisdiction and authority to enter the Release were rock solid, and Appellants' due process arguments likewise have no merit. The Confirmation Order should be affirmed.

### A.   The Release Falls Comfortably Within The Rule Under *Metromedia* And Other Second Circuit Authorities That Bankruptcy Courts May Approve Non-Debtor Releases That Are Important To A Debtor's Reorganization

The Second Circuit has long "held that '[i]n bankruptcy cases, a court may enjoin a creditor from suing a third party, provided the injunction plays an important part in the debtor's reorganization plan.'" *Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 141 (2d Cir. 2005) (quoting *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 293 (2d Cir. 1992)). Under *Metromedia*, courts may impose non-debtor releases on non-consenting creditors in "truly unusual circumstances [that] render the release terms important to the success of the plan [of reorganization]." *Id.* at 143.

By way of example, *Metromedia* recounted that the Second Circuit and other courts of appeals "ha[d] approved nondebtor releases" in a variety of "unique" circumstances, such as where "the estate received a substantial financial contribution," the "enjoined claims were 'channeled' to a settlement fund rather than extinguished," or "the enjoined claims would indirectly impact the debtor's ability to reorganize 'by way of indemnity or contribution.'" *Id.* at 142. The Second Circuit made clear, however, that the inquiry is "not a matter of factors and prongs." *Id.* Instead, as subsequent decisions have observed, "*Metromedia* is best known for establishing rough guidelines by which third-party releases should be evaluated." *In re Mal Dunn Assocs., Inc.*, 406 B.R. 622, 629 (Bankr. S.D.N.Y. 2009).

For a court undertaking that evaluation, "the challenge . . . is to parse the facts of the case before it to see whether a significant non-debtor financial contribution plus other unusual factors render a situation so 'unique' that non-debtor releases are appropriate." *Cartalemi v. Karta Corp. (In re Karta Corp.)*, 342 B.R. 45, 55 (S.D.N.Y. 2006). Here, the record established over the course of a six-day trial involving more than 40 witnesses leaves no doubt that the Release is justified by the circumstances of these Chapter 11 Cases, and that Appellants cannot surmount the hurdle of establishing that the Bankruptcy Court's fact-laden determinations were the product of "clear error" (or, for that matter, any error). *See In re Millennium Lab Holdings II, LLC*, 945 F.3d 126, 141 (3d Cir. 2019) (endorsing district court's holding that bankruptcy court's non-debtor release findings were "far from being clearly erroneous"); *Nat'l Heritage Found., Inc. v. Highbourne Found.*, 760 F.3d 344, 347 n.3 (4th Cir. 2014) (applying clear error standard to evaluate evidentiary support for non-debtor releases); *see also Metromedia*, 416 F.3d at 139 ("[W]e review conclusions of law *de novo* and findings of fact for clear error."). "[I]f the factual findings of the bankruptcy court are 'plausible in light of the record viewed in its entirety,' this Court 'may not reverse it even

6

though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.'" *Savage Assocs., P.C. v. Williams Commc'ns (In re Teligent Servs., Inc.)*, 372 B.R. 594, 599 (S.D.N.Y. 2007) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985)). Appellants fall well short of demonstrating clear error.

        *1.*     *These Chapter 11 Cases are unmistakably "unique" within the meaning of* Metromedia.

The overarching takeaway from *Metromedia* is that non-debtor releases are meant to address extraordinary problems. As such, it is imperative that the Court understand at the outset the full backdrop of these Chapter 11 Cases, the Plan, and the Release.

It is no exaggeration to say that these Chapter 11 Cases have, throughout their duration, presented some of the most extraordinary problems the American bankruptcy system has ever attempted to solve. Indeed, Judge Drain himself remarked that "these cases are the most complex, given the issues before the parties and ultimately the Court, that I have handled, and frankly that the courts under Chapter 11 have handled." Official Committee Appendix ("Appx.") 385 (Bench Ruling). Thus, it was not difficult (or clearly erroneous) for the Bankruptcy Court to find that "[c]ertainly the circumstances of these cases are unique" under any conceivable conception of the term and in myriad ways. *Id.*

To begin, "the role of the debtors . . . and their owners"—ultimately, the Sacklers—"in [the opioid] crisis ma[de] these bankruptcy cases highly unusual and complex." Appx.251. The bankruptcy proceedings concerned not only financial distress, but also broad-ranging social welfare dilemmas and personal anguish that have touched countless communities, families, and individuals across the country. Because the Debtors had no ordinary investors or shareholders (aside from the Sacklers themselves), the creditors seeking relief in the Bankruptcy Court were nearly exclusively composed of plaintiffs with claims arising out of the opioid crisis that Purdue

allegedly helped create and fuel.  "In a very real sense, every person in the range of the Debtors' opioid products, sold throughout the United States, was a potential creditor."  Appx.252. Moreover, due to the "extraordinarily harmful effects of the Debtors' primary product, the prescription drug OxyContin," the cases also involved "likely the largest creditor body ever." Appx.251-52.  And rendering the cases more distinctive still, much of the value available to creditors must derive from the estates' "enormous claims against [the Sacklers], whose aggregate net worth [was] greater than the Debtors,'" and not from the Debtors' business operations or liquid assets.  Appx.253.  *Compare, e.g.*, Appx.335 ($4.325 billion settlement of estate claims), *with* Appx.57 (Disclosure Statement App'x D) (valuation of Debtors' business assets at $1.6 to $2 billion).

These circumstances required the parties and the Bankruptcy Court to explore exceptional solutions in these Chapter 11 Cases, which involve a record 615,000 (or more) proofs of claim, and a creditor body comprising "ordinary people as well as . . . local governments, Indian tribes, hospitals and other first responders, states and territories, and the United States," among others. Appx.252.  In addition to the Official Committee, which represents the interests of the entire unsecured creditor body, certain creditors "formed well-represented ad hoc committees, including committees of the 48 states and territories that have claims against the Debtors . . . and strong representatives of non-state governmental entities and Native American tribes; personal injury claimants; victims of neonatal abstinence syndrome or their guardians, hospitals, ratepayers and third-party payors, and school districts."  Appx.318-19.  Along with the Debtors, the Official Committee and key creditor groups drove the bankruptcy process and "worked in unique and trailblazing ways to address the public health catastrophe that underl[ay] th[eir] claims." Appx.253; *see also* Appx.318 (noting that "these cases were driven as much, if not more, by the

Official Unsecured Creditors Committee and the other . . . ad hoc committees" than by the Debtors).

As a result, the Plan includes an innovative array of mechanisms meant to compensate individual victims and to combat the opioid crisis more broadly.  Of note, the Plan provides that the Debtors will cease to continue as a going concern.  On the Effective Date, the Debtors' businesses will be transferred to a new company ("NewCo") that will fund distributions to abate the opioid crisis and will develop and sell drugs to combat opioid addiction and overdoses at or near cost.  Appx.265.

The Plan also establishes seven creditor trusts to fund opioid abatement efforts on behalf of various creditor constituencies and compensate personal injury claimants.  Those trusts include: (i) the National Opioid Abatement Trust ("NOAT") that will make distributions on behalf of claims held by states, municipalities, and other non-federal domestic governmental entities; (ii) the Tribe Trust that will make distributions on behalf of claims held by tribes; (iii) the TPP Trust that will make distributions on behalf of claims held by providers of healthcare coverage benefits, including health insurers, employer-sponsored health plans, union health and welfare funds; (iv) the Hospital Trust that will make distributions on behalf of claims held by providers of healthcare treatment services or social services; (v) the NAS Monitoring Trust that will make distributions on behalf of claims relating to medical monitoring support or similar relief on account of persons who have been diagnosed with neonatal abstinence syndrome or similar conditions; (vi) the PI Trust that will make distributions on behalf of personal injury claims; and (vii) the PI Futures Trust that will make distributions on behalf of personal injury claims that arise from or relate to the use of an opioid that is manufactured by or placed in the stream of commerce by NewCo or any successor of NewCo.

The NOAT, Tribe Trust, TPP Trust, Hospital Trust, and NAS Monitoring Trusts have committed to make distributions solely for opioid abatement purposes.  *See* Appx.322-23 ("Remarkably, all parties with the exception of the personal injury claimants [being compensated for their own injuries] agreed in the mediation to use the value that they would receive solely for abatement purposes, the multiplier-effect benefits of which I've already described.").  A Master Disbursement Trust, funded out of settlement proceeds from the Sacklers' assets, will make distributions to the seven creditor trusts and otherwise administer certain estate claims and rights transferred from the Debtors.

Make no mistake:  the path to reaching the Plan over the course of nearly two years was highly uncertain and fraught at every turn.  Perhaps the single greatest challenge to a successful reorganization in these cases was determining how Purdue's value would be divided between and among competing classes of claimants:  public and private creditors, states, cities, counties, schools and tribes, personal injury victims, private hospitals, insurance companies, and other third-party payors, among others.  *See, e.g.*, Appx.115-20 ¶¶ 16-21 (G. Gotto Declaration); Appx.136, 141-42 ¶¶ 46, 63-67 (J. Guard Declaration); Appx.216-17 ¶¶ 18-22 (M. Atkinson Declaration); Appx.902-04, at 115:22-117:6 (J. Guard testimony).  Absent a negotiated agreement on these allocation issues, incredibly value-destructive estimation litigation might have been required to determine the value of the claims of each of thousands of individual creditors for purposes of allocating the Debtors' assets.  The parties succeeded in resolving their allocation disputes, but only after innumerable hard-fought negotiations, facilitated by two of the most experienced and effective mediators in the country, Kenneth Feinberg and Layne Phillips.  The intercreditor agreements that emerged were complex and interdependent, and were ultimately conditioned on a contribution of cash by the Sacklers.

10

Parties to these cases were laser focused on seeking to maximize that contribution.  Even though "from the start of these cases, all of the Debtors' assets were dedicated to the[] [creditors]" to address their claims and the underlying public health crisis, the creditors knew full well that these assets would be insufficient to provide full or even meaningful compensation, and thus "the creditor groups wanted more than anything to obtain as much value not only from the Debtors but also from the Sacklers."  Appx.319 (Bench Ruling); *see also* Appx.253 (describing "key issue" from "the start" as "how can such claims be resolved to best effect for the claimants").

To inform their views, the Official Committee conducted a massive and independent investigation and evaluation of claims against the Sacklers—part of what Judge Drain described as "the most extensive discovery process that not only I have seen after practicing bankruptcy law since 1984 and being on the bench since 2002, but I believe any court in bankruptcy has ever seen."  Appx.328; *see also* Appx.331, 394 (describing Official Committee's "own extensive analysis of potential estate claims, including vetting the Debtors' analysis of avoidable transfer claims," and "thorough[] investigat[ion] [of] the estates' claims against the Sacklers that are not in the nature of avoidable transfer causes of action but, rather, claims based on theories of alter ego, piercing the corporate veil, and breach of fiduciary duty/failure to supervise").

In an effort to avoid duplication, while ensuring that interested creditors could participate in, and share the fruits of, its investigation of claims against the Sacklers, the Official Committee agreed to what it believes to be a nearly unprecedented cooperation agreement with the states and other ad hoc groups of creditors.  In a stipulation so ordered by the Court on July 31, 2020, the Official Committee agreed to share with other creditor parties, on a common interest basis, documents of interest identified during document review, factual analyses, and certain other privileged and work product material relating to its investigation of estate claims against the

Sacklers and others.  *See* Appx.28-41.  The former group of Non-Consenting States (*i.e.*, the former group of 24 states and the District of Columbia which did not support the Debtors' proposed settlement framework at the outset of the bankruptcy cases), which included all of the state Appellants, took part in this cooperative effort and, among other things, was given access to many documents obtained by the Official Committee, and much of its work product.  Ultimately, the majority of the former Non-Consenting States voted in favor the Plan.

The parties began what they referred to as "Phase II" of the mediation in or around September 2020, with the objective of determining whether a settlement agreement could be reached with the Sacklers.  After weeks of hard-fought negotiations, Messrs. Feinberg and Phillips made a "mediators' proposal" to settle the claims against the Sacklers for $4.275 billion.  The Official Committee, about half of the states, the Debtors, and the Sacklers agreed, while 24 states and the District of Columbia continued to object.  The Bankruptcy Court ordered the holdouts to engage in a further mediation before Bankruptcy Judge Chapman, which spanned 140 discussions and 27 hours, and ultimately led to 15 of the states "that had previously fought the Sacklers settlement tooth and nail agree[ing] to the modified settlement in the amended plan."  *E.g.*, Appx.280, 285, 299, 319-20.   The modified settlement called for (i) enhanced economic consideration to be provided by the Sackler family members in the form of $50 million in incremental cash payments and acceleration of $50 million in previously agreed settlement payments, resulting in total payments of $4.325 billion, (ii) a material expansion of the scope of the public document depository to be established pursuant to the Plan, including certain attorney-client privileged documents, (iii) a prohibition with regard to the Sackler family's naming rights related to charitable contributions until they have fully paid all obligations owed by them under the settlement and exited the opioid business worldwide, and (iv) modifications to certain aspects

12

of the Plan concerning the sale of assets of NewCo and distribution of funds from the NOAT.  *See* Appx.447 (Confirmation Order).  In addition, the individual trustees of NOAT, or another qualified party selected by the Bankruptcy Court, will become the controlling members of the Raymond and Beverly Sackler Foundation and the Raymond and Beverly Sackler Fund for the Arts and Sciences, which shall have an aggregate value of at least $175 million and will be used only for purposes to ameliorate the opioid crisis.  *Id.*

As a statutory fiduciary for all unsecured creditors, the Official Committee authored a public letter explaining the reasons for its support of the proposed plan and settlement.  In the Bankruptcy Court's words, the letter "recognize[d] the Committee's role in balancing the interests of personal injury creditors with those of the states and other entities that also assert claims, and strongly support[ed] confirmation of the plan as a fair balance of those interests."  Appx.310; *see* Appx.223-46 (UCC Plan Support Letter).

As the Bankruptcy Court underscored, the degree of creditor consensus and support was remarkable in several respects.  For example, the Bankruptcy Court described "[t]he states' unanimous agreement to accept their recovery in the form of money solely devoted to opioid abatement, and their nearly unanimous agreement on the allocation of that distribution among them," to be "truly remarkable, and, as noted during the confirmation hearing by the Attorney General of West Virginia, likely [to] serve as a model for the allocation of future settlement proceeds from other opioid manufacturers and distributors among the states."  Appx.300.  In terms of voting, "an unprecedented number of votes were cast on the plan, over 120,000," in contrast to the few thousand typically seen even in large chapter 11 cases.  Appx.258-59.  The Plan was also "overwhelmingly accepted, including by the classes affected by the third-party claims," and

ultimately received a favorable vote from more than 95% of voting creditors—a further "remarkable result." Appx.259, 386.

It was for these reasons—and to address attempts to "mislead[] the public"—that the Bankruptcy Court took pains to emphasize "this is *not* the Sacklers' plan." Appx.318. Rather, it is "a plan agreed to by 79 percent of the states and territories and well over 96 percent of the non-state governments, and actively supported by the Official Unsecured Creditors Committee and the other ad hoc committees, notwithstanding the incredible harm that the Debtors' products have caused their constituents." Appx.321. It was with the foregoing perspective that creditors by an incredible margin supported, and the Bankruptcy Court approved, the Plan. The Plan is far from perfect, "[b]ut one also must look at the process and the issue in the light of the alternatives and with a clear understanding of continued litigation versus the settlements set forth in the plan." *Id.*

In short, the circumstances of these cases undoubtedly are "unique," *Metromedia*, 416 F.3d at 142, including based on the literally unprecedented value and number of claims filed, the competition between and among different types of public and private creditors, and the alleged role of Purdue's owners in igniting arguably the worst man made public health crisis in American history. But more importantly, these cases are unique in providing a means to abate that crisis, and to mitigate the suffering it causes every day, through the prompt deployment of billions of dollars to persons and communities in desperate need of funding. Indeed, the Bankruptcy Court recently found (again) that the distributions under the Plan are to be put to use "for the immediate needs of the individual victims and for abatement purposes at a time when every dollar counts [a]nd as time passes, the problem only gets worse." Appx.922 at 274:2-6 (Nov. 9, 2021 Hr'g Tr.). As discussed below, the Release is required in order for the assets of Purdue to be devoted promptly to abating

14

the crisis, rather than dissipated through potentially years of conflict among creditors and with the Sacklers, and is more than justified under *Metromedia* and other Second Circuit case law.

>   2.   *The Release provides and protects substantial consideration that is central to the Plan and its success.*

As a guide to applying *Metromedia* and evaluating the propriety of non-debtor releases, in addition to requiring unique circumstances, courts have looked to three primary considerations: (i) whether substantial consideration is being offered for the release; (ii) whether "the success or failure of the plan is truly premised upon the consideration provided for the release"; and (iii) whether "the release itself is an essential component of the plan." Appx.924 at 102:2-7 (Dec. 21, 2017 Hr'g Tr., *In re Global A&T Elecs. Ltd.*, No. 17-23931 (Bankr. S.D.N.Y.) [ECF No. 66]). Each consideration plainly supports the approval of the Release under the Plan.

*First*, the Bankruptcy Court's finding that the "amount being paid under the settlement is substantial," Appx.386, is unassailable. The $4.325 billion contribution from the Sacklers "is to [the Bankruptcy Court's] knowledge the highest amount that any shareholder group has paid for these types of claims." Appx.352. The settlement also includes various non-monetary concessions, which are likewise "substantial" by any measure:

>   the dedication of the two charities worth at least $175 million for abatement purposes, the Sacklers' agreement to a resolution on naming rights, their agreement not to engage in any business with NewCo, their agreement to exit their foreign companies within a prescribed time, their agreement to various "snap back" protections to ensure the collectability of their settlement payments, and their agreement to an unprecedented extensive document depository accessible to the public that will archive in a comprehensive way the Debtors' history, including as it relates to the development, production, and sale of opioids.

Appx.324, 386-87. Indeed, the record demonstrates that significant creditor constituencies viewed these terms to be at least as important as the Sacklers' financial contribution under the Plan. Appx.400-02, 405.

To the extent the state Appellants are more interested in cash, they certainly will receive substantial amounts under the Plan.  Through the NOAT that will be created by the Plan, those entities (and their political subdivisions) will receive the following amounts:

| State Appellants and their Subdivisions | Estimated Allocation |
|---|---|
| California | $397 million |
| Washington | $93 million |
| Maryland | $84 million |
| Oregon | $58 million |
| Connecticut | $54 million |
| Delaware | $20 million |
| Rhode Island | $20 million |
| Vermont | $12 million |
| District of Columbia | $9 million |
| **Total:** | **$747 million** |

Appx.219-20 ¶ 31 (M. Atkinson Declaration) (excluding state which objected but did not appeal).

Furthermore, the Bankruptcy Court observed that non-monetary concessions will address states' and the public's interest in other ways, including through the creation of the document depository that "will provide far more transparency to the conduct of Purdue and those that did business with and those who regulated it . . . than would renewed litigation and any eventual trials against various members of the Sackler family."  Appx.405-06.  Indeed, "[t]he record to be established by the public document depository is important for the continued pursuit of lawsuits against other parties in this industry, and it will guide legislatures and regulators about how to better address other companies with lawful products that also are incredibly dangerous."  Appx.406.  As such, "the document depository is perhaps the most important aspect of the settlement, even more important than the billions of dollars being paid by the shareholder released parties."  Appx.405.

*Second*, the "monetary contributions by the Sacklers and their related entities [were] critical" to the success of the Plan, as the Bankruptcy Court explicitly found.  Appx.385.  As noted above, perhaps the greatest challenge faced by the parties to these cases was determining how the value of Purdue (including estate claims against the Sacklers) would be allocated between and among the many different types of creditors vying for compensation from Purdue.  These diverse claimants reached a series of interlocking agreement resolving the allocation issue, but did so only after months of hard-fought negotiations, and with the aid of two of the nation's most highly regarded mediators.  Maintaining the crucial but delicate balance struck by the parties in this "Phase I" allocation mediation depended expressly on Purdue later obtaining the Sacklers' commitment to contribute billions of dollars of additional cash.  *See* Appx.238-39 (UCC Plan Support Letter) (recounting that "Phase I" mediation agreement between public and private claimants on allocation was predicated on whether in "Phase II" mediation Sacklers would increase their contribution, all of which would go to public creditors).

The Bankruptcy Court specifically found that each of the creditor allocation settlements "hinges on at least the amount of money to be distributed under the plan coming from the Sacklers and their related entities in return for (x) the Debtors' settlement and (y) the third-party claims settlement."  Appx.323.  The record was "clear" that without "the $4.325 billion being paid by the Sacklers under the plan and the other elements of the Sackler settlements, those other elements of the plan would not happen."  *Id.*  Simply put, absent the consideration provided by the Sacklers, the "plan would unravel, including the complex interrelated [allocation] settlements . . . in addition to the non-monetary consideration under it."  *Id.*

*Third*, both the evidentiary record and common sense establish that the Release itself is an essential component of the Plan.  Unsurprisingly, members of the Sackler family testified at the

hearing that they would not agree to provide the consideration upon which the Plan hinges—$4.325 billion, in addition to other elements of the Sackler settlement—absent the Release.  *See* Appx.111 ¶ 4 (D. Sackler Declaration); Appx.911, at 27:10-13 (D. Sackler testimony); Appx.913-14, at 126:19-127:6 (R. Sackler testimony); Appx.916-17, at 118:16-18 (M. Sackler testimony). As the Bankruptcy Court held, the "released parties are not going to agree to provide the consideration under the settlement without receiving the shareholder release in return," a conclusion that even Appellants presumably would not dispute.  *See* Appx.386.  If the "settlements with the Sacklers fell away," the "other settlements interrelated to those settlements . . . would not be achievable" either, and the Plan itself would be doomed.  Appx.322.

Significantly, the non-consensual third-party Release was necessary not only to obtaining support for the plan from the Sacklers, but also from creditors.  If a handful of dissenting creditors, like the state Appellants, were permitted to resume litigating while supporting creditors were bound by the Plan, the holdouts could unfairly exercise their monopoly on litigation leverage to extract disproportionate value from the Sacklers.  And if any of them managed to win a substantial verdict against the Sacklers, it could put other creditors' agreed recoveries in jeopardy, which are due to be paid out over as many as nine years after emergence.  Therefore, and although it is self-evident, witnesses and counsel for significant creditor groups confirmed at the confirmation hearing that they would not have agreed to the global settlement, and to limit themselves to the guaranteed recoveries available under the Plan, unless all stakeholders were bound by the Release. *See* Appx.906-09, at 76:16-79:22; Appx.919-20, at 97:14-98:7.

### 3. *Appellants all but concede* Metromedia *is satisfied.*

Appellants devote only a tiny fraction of their lengthy submissions to arguing that the Bankruptcy Court wrongly applied *Metromedia* in these cases, focusing instead on their contention that *Metromedia* was wrongly decided by the Second Circuit in the first place.  *See* Part I.B, *infra*.

Appellants do not dispute, for example, that the billions of dollars (and other consideration) to be provided by the Sacklers in exchange for the Release is "substantial."  Nor do Appellants claim that the Sacklers would have been willing to supply that consideration absent the Release—a claim that, in any event, would defy both the record evidence and common sense.  And Appellants admit, as they must, that the Plan would collapse without the Sackler consideration.  *See, e.g.* Wash. Br. 8 (acknowledging that Plan "depend[s] on the Sacklers' financial contribution").

Instead, Appellants argue, without the slightest evidentiary support, that a *different plan* could have garnered sufficient creditor support to succeed without any contribution from the Sacklers, and hence without the Release.  *E.g.*, Md. Br. 56; UST Br. 51.  Having themselves participated in, or at least followed, these Chapter 11 Cases and the complex, multi-layered negotiations that finally led to the agreements embodied in the Plan, Appellants should know better.  As the record reflects, neither Appellants nor anyone else ever came forward with a practical way out of bankruptcy that did not involve a large contribution from the Sacklers in exchange for Release.

That is because the Plan, and the compromises it embodies, are necessary to address the unique challenges presented by these cases.  As referenced above, and as the Bankruptcy Court specifically found, delicate inter-creditor agreements were required to avoid value-destroying litigation in the Bankruptcy Court.  Those agreements would fall apart without substantial cash from the Sacklers, resulting in creditors resuming their race to the courthouse, bearing the costs of litigation, and facing indefinite delays and inevitable difficulties in obtaining any actual recovery from the Sacklers.  Appx.323-24, 339-40, 392.  Indeed, under the circumstances, the Court found that, absent the settlements, the "most realistic scenarios" showed that "there would literally be *no* recovery by unsecured creditors from the estates in a Chapter 7 liquidation."  Appx.340.

Appellants suggest that Purdue's diverse creditor body "might" instead have agreed on a plan that did not include a Sackler contribution and release, and called for endless and uncertain litigation against the Sacklers.  But the standard for approval in this Circuit of a non-consensual third-party release is whether the release is necessary for the success of the plan that is actually under review, not some hypothetical plan that an objector speculates might have garnered creditor support.  *Metromedia*, 416 F.3d at 143.  Moreover, the actual evidence demonstrates that the Release was necessary to obtaining support from key constituencies and to the inter-creditor agreements at the heart of the Plan.  *See* Appx.217 ¶ 22 (M. Atkinson Declaration) ("I understand that certain representatives of the Public Opioid Claimants would not confirm that the Public Opioid Claimants would honor the Intercreditor Agreements absent a settlement with the Sacklers included in a plan of reorganization in chapter 11."); Appx.142 ¶ 67 (J. Guard Declaration) ("Absent the large pool of assets to divide that the Sackler contribution gave, it is my opinion that each side would have likely been at an impasse and asserted its various defenses to allowance of the other's claims, and there would have been a lengthy set of estimation hearings in this bankruptcy matter, further dissipating this estate.").

Appellants also complain that the Plan does not pay all claims of all of Purdue's creditors in full.  *E.g.*, Wash. Br. 35.  Of course not; no plan could.  The more than 615,000 proofs of claim timely filed in these cases, included approximately 65,000 proofs of claims alleging damages in the aggregate of more than 40 *trillion* dollars (excluding a single proof of claim asserting 100 trillion dollars in damages).  *See* Appx.94 ¶ 8 (C. Pullo, Prime Clerk, Final Voting Declaration). If every penny of the Sacklers' wealth somehow could be recovered by the estates, Purdue's creditors still would be paid only a minute portion of the amounts claimed.  Hence, as the Bankruptcy Court ruled, "more relevant than the prospect of full payment" is "the fairness of the

settlement to the third party claimants." Appx.388.  After canvassing the evidence, the Bankruptcy Court concluded that "if I denied confirmation" Appellants' recovery against the Debtors and the Sacklers "would be materially less than their recovery under the plan."  Appx.393.

The U.S. Trustee also continues to paint a picture of "victims, states, and other creditors" monolithically opposing the Plan.  UST Br. 1.  According to the U.S. Trustee, the Court should take the view that only "some of the opioid creditors voted in favor of the Plan" because not all creditors eligible to vote did so and "even the votes for the Plan" should not count as support for the Release.  UST Br. 26 n.6.  The record evidence flatly refutes those efforts to undercut the support for the Plan.  The Bankruptcy Court rightly found it "baffling" to "not look at the votes cast but at the votes that were not cast" because "[t]hat, of course, is not how elections are conducted. . . . [W]here a vote is as extensive as occurred here, under any measure this plan has been overwhelmingly accepted."  Appx.260.

Maryland's emphasis on the percentage of the U.S. population that the state Appellants represent falters along similar lines.  *See* Md. Br. 46.  That certain State Attorneys General have made the decision to continue opposing the Plan in no way translates to 20% of the Nation taking that view.  Nor can that figure—which conveniently ignores the other 80% of the population in non-appealing states—obscure the overwhelming support for the Plan, including by actual victims of the opioid epidemic.  *See* Appx.259 ("For the personal-injury claims classes, the vote was 95.7 percent (Class 10(b)) to over 98 percent (Class 10(a)).").

The balance of Appellants' arguments purports to conduct a *Metromedia* analysis.  But really, the arguments are simply a façade for making paternalistic and charged statements—*e.g.*, that the "coerced settlement does little for individual creditors," UST Br. 52, and that the Release represents an "abuse" of the bankruptcy process meant to serve as a "backdoor for billionaire

justice," Wash. Br. 27-36—that denigrate the difficult choices and compromises creditors have made throughout these Chapter 11 Cases.  Like Appellants, the creditors that support the Plan would like to hold the Sacklers accountable.  But unlike Appellants, the creditors that support the Plan have done so by focusing on the realities of the Chapter 11 Cases and, above all, the best option for obtaining timely compensation or redress for the devastating harms of the opioid crisis. To quote the Bankruptcy Court:

> A settlement is not evaluated in a vacuum, as a wish list. It takes an agreement, which means that if properly negotiated—and I believe that's clearly the case here—it generally reflects the underlying strengths and weaknesses of the opposing parties' legal positions and issues of collection, not moral issues or how someone might see moral issues.
>
> It is not enough simply to say "we need more," or "I don't care whether we don't get anything; I'd rather see it all burned up before the Sacklers keep anything."  One must focus on the foreseeable consequences of litigation versus settlement.

Appx.350.

### B.   *Metromedia* **And The Second Circuit's Extensive Non-Debtor Release Cases Were Not "Wrongly Decided," As Appellants Contend**

As noted above, for at least 30 years, the Second Circuit has held in a variety of circumstances that bankruptcy courts "may enjoin a creditor from suing a third party, provided the injunction plays an important part in the debtor's reorganization plan."  *E.g.*, *In re Drexel Burnham*, 960 F.2d at 293.  At least seven other Courts of Appeal agree, including in recent cases that the Supreme Court has declined to take up.  *See, e.g.*, *In re Millennium Lab Holdings*, 945 F.3d at 137-40 (3d Cir.), *cert. denied sub nom. ISL Loan Tr. v. Millennium Lab Holdings II, LLC*, 140 S. Ct. 2805 (2020); *SE Prop. Holdings, LLC v. Seaside Eng'g & Surveying (In re Seaside Eng'g & Surveying, Inc.)*, 780 F.3d 1070, 1076-79 (11th Cir. 2015), *cert. denied sub nom. Vision-Park Props. v. Seaside Eng'g & Surveying*, 577 U.S. 823 (2015); *Nat'l Heritage Found.*, 760 F.3d at 350 (4th Cir.), *cert. denied*, 135 S. Ct. 961 (2015); *see* Appx.368-372 (collecting cases in majority

and explaining that Appellants' circuit authority cases do not actually suggest, or have been read not to impose, a categorical prohibition of non-debtor releases).

According to Appellants, all these Circuit courts are simply wrong, and have been misconstruing the Bankruptcy Code and the Constitution for decades.  In reality, however, it is Appellants who are mistaken.  Under appropriate circumstances, including those presented here, non-debtor releases are authorized by the plain terms of the Bankruptcy Code and related jurisprudence, and are perfectly consistent with the Constitution's broad grant of power to Congress "to enact uniform laws on the subject of Bankruptcies throughout the United States." U.S. Const. art. I, § 8, cl. 4.

> ### 1.    The Bankruptcy Code authorizes non-debtor releases.

Bankruptcy courts' long-recognized authority to grant non-debtor releases is rooted in Congress's exercise of its preemption powers regarding creditors' rights, and in two specific provisions of the Bankruptcy Code that work in tandem:  sections 105(a) and 1123(b)(6).

Section 105(a) authorizes bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code, 11 U.S.C. § 105(a), reflecting a "traditionally broad" grant of equitable powers.  *Airadigm Commc'ns, Inc. v. FCC (In re Airadigm Commc'ns, Inc.)*, 519 F.3d 640, 657 (7th Cir. 2009); *see also In re Metromedia*, 416 F.3d at 142.  In line with that authority, section 105(a) has been "construed liberally to enjoin suits that might impede the reorganization process."  *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 93 (2d Cir. 1988).  That includes "claims against a non-debtor third party where those claims . . . 'pose[] the specter of direct impact on the *res* of the bankrupt estate.'" *Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199, 211 (2d Cir. 2014).

Section 1123(b)(6), in turn, provides that a plan of reorganization may "include any . . . appropriate provision not inconsistent with the applicable provisions of this title," 11 U.S.C.

§ 1123(b)(6), and makes clear that section 105(a)'s "broad grant of authority" carries over into the confirmation context. *Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648, 656 (6th Cir. 2002). Section 1123(b)(6) confers "considerable discretion to approve plans of reorganization," *id.*, by allowing a reorganization plan to "include any . . . appropriate provision not inconsistent with the applicable provisions of this title," 11 U.S.C. § 1123(b)(6). As such, non-debtor "releases [a]re authorized by 'sufficient statutory authority under the Bankruptcy Code." 280 F.3d at 657-58 (discussing how section 1123(b)(6) authorizes releases and is not limited "by a non-bankruptcy law limitation on the bankruptcy court's equity power" because "statutory grant of power" of section 105(a)).

Appellants characterize section 105—either alone or alongside section 1123(b)(6)—as "vague" and insufficient authority for non-debtor releases. *See* UST Br. 40; Wash. Br. 20-24; Cal. Br. 7-8. But the Supreme Court has not relegated those provisions to the sidelines of the reorganization process. On the contrary, in *United States v. Energy Resources Co.*, the Supreme Court relied on sections 105(a) and 1123(b)(6)—and nothing more—to hold that a bankruptcy court could treat tax payments as trust fund payments so long as the court "determines that this designation is necessary for the success of a reorganization plan"—even though the Bankruptcy Code did not expressly authorize such treatment. 495 U.S. 545, 546 (1990); *see id.* at 549 (noting bankruptcy court's "residual authority" under sections 105(a) and 1123(b)(5) (now section 1123(b)(6)). Likewise, "courts have relied upon § 105(a) to marshal assets, issue provisional injunctions, allow early payment of prepetition claims to creditor-vendors who threaten to withhold goods and services essential to the debtor's business operations, and partially discharge student debts, even though nothing in the Code expressly authorizes these orders." Joshua M.

Silverstein, *Hiding in Plain View:  A Neglected Supreme Court Decision Resolves the Debate over Non-Debtor Releases in Chapter 11 Reorganizations*, 23 EMORY BANKR. DEV. J. 13, 40 (2006).

Appellants' primary Second Circuit authority, *New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart Convenience Stores, Inc.)*, 351 F.3d 86 (2d Cir. 2003), is not to the contrary.  The Second Circuit noted only that the statutory language "suggest[ed] that an exercise of section 105 power be tied to another Bankruptcy Code section and not merely to a general bankruptcy concept or objective."  *Id.* at 92.  *Metromedia*, in turn, discusses section 105(a) and *Dairy Mart* at length and *still* reiterates that non-debtor releases are permissible.  *See* 416 F.3d at 142.  And in the end, as discussed above, sections 105(a) *and* 1123(b)(6) authorize the Release.

In sum, "Congress *affirmatively* gave the bankruptcy court the power to release third parties from a creditor's claims without the creditor's consent."  *In re Airadigm Commc'ns*, 519 F.3d at 657 (emphasis added); *see also In re Dow Corning*, 280 F.3d at 656; *Lynch v. Lapidem Ltd. (In re Kirwan Offices S.A.R.L.)*, 592 B.R. 489, 511 (S.D.N.Y. 2018) ("[T]he third-party releases contained in a confirmed plan are subject to 11 U.S.C. §§ 1129(a)(1), 1123(b)(5) & (6), 105, and 524(e)."); Appx.374-75.  In light of sections 105(a) and 1123(b)(6), the crucial question is not (as Appellants insist) whether the Bankruptcy Code allows non-debtor releases (it clearly does).  Rather, the crucial question is under what circumstances such injunctions are necessary or appropriate.  *See In re Specialty Equip. Cos.*, 3 F.3d 1043, 1047 (7th Cir. 1993) ("While a third-party release . . . may be unwarranted in some circumstances, a per se rule disfavoring all releases in a reorganization plan would be similarly unwarranted, if not a misreading of the statute.").  As discussed in the balance of this section, Appellants provide no basis for cabining—or even negating altogether—bankruptcy courts' traditional authority to approve non-debtor releases.

> 2.  *None of the Bankruptcy Code provisions cited by Appellants limits a bankruptcy court's power to release third-party claims.*

Appellants offer a collective smorgasbord of statutory and decisional authority in their bid to prove that non-debtor releases are prohibited.  It proves unsatisfactory in every respect.

For starters, certain Appellants invoke section 524(g), which authorizes the release of third-party claims in the asbestos context, to argue by negative implication that third-party releases are not authorized in any other context.  *See* UST Br. 38-41; Cal. Br. 7-10.  But Congress was explicit in a savings clause that section 524(g) should not be read that way:  "Nothing in [the subsection enacting section 524(g)] shall be construed to modify, impair or supersede any other authority the court has to issue injunctions in connection with an order confirming a plan of reorganization."  108 Stat. 4117 (1994); *see also* 2 COLLIER ON BANKRUPTCY ¶ 105.04.  Without any textual basis, the U.S. Trustee argues that this straightforward language applies only to asbestos-related injunctions established prior to the enactment of section 524(g).  UST Br. 39 n.13.  But the language of the savings clause is not so limited.  Moreover, the Committee report noted that "debtors in other industries are reportedly beginning to experiment with similar mechanisms" yet "express[ed] no opinion as to how much authority a bankruptcy court may generally have under its traditional equitable powers to issue an enforceable injunction of this kind."  H.R. Rep. No. 103-834, at 12 (1995); 140 Cong. Rec. H10,765 (Oct. 4, 1994); *see also* 140 Cong. Rec. S14,461 (daily ed. Oct. 6, 1994) (rem. of Sen. Heflin).

Notably, the federal government elsewhere has acknowledged that non-debtor releases are, or at least may be, available for non-asbestos claims.  As late as the confirmation hearing itself, for example, the U.S. Trustee—citing the same Fifth Circuit authority it now relies upon—admitted that there could be "limited circumstances . . . where a non-debtor release could be appropriate as a method to channel mass claims toward a specific pool of assets in a non-asbestos context."

Appx.73 n.11 (citing *Bank of N.Y. Tr. Co., N.A. v. Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229, 252 (5th Cir. 2009)).   Similarly, earlier this year, the federal government *defended* a non-consensual third-party release that was included in a proposed plan of reorganization for the Exide Holdings debtors.   Taking a strikingly different stance from these cases, the federal government actually filed a brief opposing an appeal of the confirmation order, and argued that the releases in that case were justified and "necessary" to facilitate a confirmable plan.   Appx.935.   The federal government explicitly argued "that non-consensual third-party releases *are permissible*" so long as "'hallmarks of permissible non-consensual releases—fairness, necessity to the reorganization, and specific factual findings'"—are "present."   Appx.952-53 (quoting *In re Cont'l Airlines*, 203 F.3d 203, 214 (3d Cir. 2000)) (emphasis added).   The federal government further argued that "[t]he Bankruptcy Court *has the power* to consider the adequacy of the Third Party Releases and Injunction and did so using the appropriate legal and factual standards."   Appx.956 (emphasis added).

Appellants next argue that non-debtor releases are inconsistent with sections 524(a), 524(e) and 1141(d), *i.e.*, provisions that concern the effect of a discharge of the debtor. *See* 11 U.S.C. § 524(a) (detailing judgments voided and actions enjoined by discharge); *id.* § 524(e) (providing that "discharge of a debt of the debtor does not affect the liability of" third parties for "such debt"); *id.* § 1141(d) (describing how, subject to certain exceptions, plan confirmation "discharges the debtor from any debt that arose before the date of such confirmation"); *see also* UST Br. 40; Cal. Br. 7.   Appellants are mistaken.   While these sections describe the mandatory effects of a debtor discharge, they "do[] not purport to limit or restrain the power of the bankruptcy court to otherwise grant a release to a third party."   *In re Specialty Equip.*, 3 F.3d at 1047.

Indeed, the exact argument made by Appellants here has repeatedly been rejected by courts in this Circuit and elsewhere. *See id.*; *In re Seaside*, 780 F.3d at 1078 ("[Section] 524(e) says nothing about the authority of the bankruptcy court to release a non-debtor from a creditor's claims."); *In re Airadigm Commc'ns*, 519 F.3d at 656 ("The natural reading of [section 524(e)] does not foreclose a third-party release from a creditor's claims."); *In re Dow Corning*, 280 F.3d at 657 ("[T]his language . . . does not prohibit the release of a non-debtor."); *Gillman v. Cont'l Airlines (In re Cont'l Airlines)*, 203 F.3d 203, 211 (3d Cir. 2000) ("[Section 524(e)] makes clear that the bankruptcy discharge of a debtor, *by itself*, does not operate to relieve non-debtors of their liabilities." (emphasis added)).  The same is true of section 1141(d).  Thus, contrary to Appellants' position, the authorization of non-debtor releases under sections 105(a) and 1123(b)(6) does not impermissibly "override explicit mandates of other sections of the Bankruptcy Code."  *Law v. Siegel*, 571 U.S. 415, 421 (2014).

Taking a less direct approach, Appellants also claim that non-debtor releases conflict with other provisions of the Bankruptcy Code because non-debtors could not obtain the same relief if they had filed for bankruptcy.  *See* UST Br. 41-42; Wash. Br. 16.  In particular, Appellants point to several subsections of section 523(a) that prohibit discharge of debts for fraud, breach of fiduciary duty, willful and malicious injury, and fines, penalties, or forfeitures payable for the benefit of a governmental unit.  *See* 11 U.S.C. § 523(a)(2), (4), (6), (7).  By their terms, however, these provisions are limited to debtors.

Nor can they be applied by extension to non-debtors.  *See Meksavanh v. Senouthai (In re Senouthai)*, No. AP 15-00425-MDC, 2019 WL 1400090, at *7 (Bankr. E.D. Pa. Mar. 26, 2019) ("The plain language of [section 523(a)] limits its application to debtors, and to the extent a party is not a debtor, § 523 has no application."); *Davila v. Peralta (In re Peralta)*, No. 16-21251 (RG),

2019 WL 6048531, at *5 (Bankr. D.N.J. Nov. 14, 2019) ("Because the Non-Debtor Defendants are not debtors, they cannot be subject to a non-dischargeability judgment."). Instead, non-debtor releases are governed by a different statutory, equitable, and jurisdictional framework, which already accounts for the involvement of third parties through various guardrails. *See* Appx.375-76 ("All courts considering whether to approve a third-party claims release under a plan have noted that such power is subject to considerable scrutiny and may be exercised only in limited, rare cases."). Appellants cannot simply mix and match the debtor and non-debtor frameworks.

All of the foregoing makes *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973 (2017), readily distinguishable. In *Jevic*, the Supreme Court held that a bankruptcy court's structured dismissal, which provided for distributions that did not follow ordinary priority rules, contravened the Bankruptcy Code. But that case had three critical features that this case does not: (i) the structured dismissal violated the priority system, "a basic underpinning of business bankruptcy law," *id.* at 983; (ii) "nothing in the statute" evinced congressional intent to depart from the priority system when dismissing a chapter 11 case, *id.* at 984; and (iii) the structured dismissal did not otherwise further any "significant Code-related objectives," *id.* at 985. By contrast, properly authorized non-debtor releases: (i) are grounded in bankruptcy courts' foundational equitable power to facilitate reorganizations and statutory power to confirm plans; (ii) find support in both sections 105(a) and 1123(b)(6), and do not run afoul of any other Bankruptcy Code provision; and (iii) further significant Bankruptcy Code-related objectives because they must be "necessary" to carry out the provisions of the Bankruptcy Code, 11 U.S.C. § 105(a).

### 3. The Bankruptcy Code includes no "police power exception" to a bankruptcy court's power to grant non-debtor releases.

Unable to overcome the Second Circuit's clear and longstanding recognition that non-debtor releases are authorized by the Bankruptcy Code, the state Appellants seek a special carve-

out for police power actions.  No such exception exists.  A bankruptcy court can enjoin police power actions where necessary to carry out the provisions of the Bankruptcy Code, as this Court recognized when it affirmed Judge Drain's order pursuant to section 105(a) temporarily halting actions brought against Purdue and the Sacklers pre-petition by Appellants and other governmental entities.  *See Dunaway v. Purdue Pharms. L.P. (In re Purdue Pharms. L.P.)*, 619 B.R. 38, 58-62 (S.D.N.Y. 2020) (rejecting "impl[ication] [made] several times in [appellants'] papers that 'police power litigation against a non-debtor' should be treated differently than other litigation stayed under a Section 105(a) order").

This Court's conclusion is supported by familiar principles of statutory interpretation as applied to the Bankruptcy Code by the Supreme Court.  "Where Congress has intended to provide regulatory exceptions to provisions of the Bankruptcy Code, it has done so clearly and expressly." *FCC v. NextWave Pers. Commc'ns, Inc.*, 537 U.S. 293, 302 (2003).  "There is, however, no [police power] bar or exception under the Bankruptcy Code" that would apply to non-debtor releases. Appx.399.  Notably, as discussed below, even a provision that arguably includes a "clear[] and express[]" exception for police power actions like section 362(b)(4) must yield to the court's power to enjoin such actions under section 105(a), a provision that includes no such exception.

The state Appellants nevertheless argue that such an exception "must" exist because "foundational principles of state sovereignty, comity and federalism apply in bankruptcy proceedings."  Wash. Br. 15.  In fact, the Supreme Court has long refused to grant special solicitude in bankruptcy matters to states simply because they are states.  Even with respect to discharges, "[u]nder . . . longstanding [Supreme Court] precedent, States, whether or not they choose to participate in the proceeding, are bound by a bankruptcy court's discharge order no less than other creditors."  *Tenn. Student Assistance Corp. v. Hood*, 541 U.S. 440, 448-49 (2004) (discussing

30

examples, including holding in *Van Huffel v. Harkelrode*, 284 U.S. 225, 228-29 (1931), "that the Bankruptcy Court had the authority to sell a debtor's property 'free and clear' of a State's tax lien"); *see, e.g.*, *Pa. Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 555 (1990) (holding that bankruptcy courts may discharge criminal restitution orders in chapter 13 proceedings), *superseded by* Criminal Victims Protection Act of 1990, Pub. L. No. 101-581, § 3, 104 Stat. 2865. Accordingly, the default rule is that states are treated no differently than the hundreds of thousands of other unsecured creditors (including a supermajority of states) in these Chapter 11 Cases.

None of the Bankruptcy Code or other provisions cited by Appellants as evidencing "deference" for states remotely suggests an exception to the default rule in the context of non-debtor releases. Wash. Br. 14-16; Md. Br. 50-51.  For instance, while section 362(b)(4) prevents police power actions from being stayed *automatically*, courts retain the power to enjoin police power actions under section 105(a).  Indeed, in these very Chapter 11 Cases, relying on section 105(a), this Court affirmed the Bankruptcy Court's order enjoining the continuation or commencement of actions that Appellants and other states claimed fell within the police powers exception to the automatic stay.  *See In re Purdue Pharms.*, 619 B.R. at 57 (clarifying that section 105(a) is "the basis for the injunction" and that "the police powers exception is irrelevant to this appeal, because the Preliminary Injunction was not entered pursuant to the automatic stay provision").

In other words, Appellants' best example of a purported "police power" exception in the Bankruptcy Code—section 362(b)(4)—is hardly an exception at all.  It can be trumped by the very sections this Court previously relied on to enjoin police power claims, *id.*, and the Bankruptcy Court relied on to grant the Release, Appx.374-75, 381.  Those rulings are correct.  Courts have consistently concluded that bankruptcy courts may use their "discretionary power under 11 U.S.C.

§ 105(a)" to stay actions—including police power actions—not otherwise subject to the automatic stay. *See, e.g.*, *Picard*, 762 F.3d at 211 (noting that courts have "consistently . . . found that section 105 may be used to stay actions against non-debtors even where [the automatic stay] otherwise would not provide such relief"); *Penn Terra Ltd. v. Dep't of Env't Res., Com. of Pa.*, 733 F.2d 267, 273-74 (3d Cir. 1984) (noting that bankruptcy court in "its discretion, may issue an appropriate injunction, even if the automatic stay is not operative" as to a police power action); *Browning v. Navarro*, 743, F.2d 1069, 1084 (5th Cir. 1984) ("A bankruptcy court has the power to enjoin proceedings excepted from a § 362 stay under [section 105]."); *In re Commonwealth Cos.*, 913 F.2d 518, 527 (8th Cir. 1990) (similar); *In re Neuman*, 71 B.R. 567, 572 (S.D.N.Y. 1987) ("Even if [section 362(b)(4)] does apply to [the] state court action . . . , the Bankruptcy Court's broader equitable powers under § 105 permit it to enjoin the state proceeding.").  In so doing, courts have followed Congress's explanation in enacting the Bankruptcy Code that section 105(a) would give courts "ample other powers to stay actions not covered by the automatic stay."  S. Rep. No. 95-989, at 51 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5837; H.R. Rep. No. 95-595, at 342 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6298.

Sections 523 and 1123(a) likewise do not suggest that a release of police power claims against third parties is impermissible.  As noted, section 523(a)'s exceptions apply only to the discharge of a debtor's prepetition claims and do not extend to the completely different context of non-debtor releases.  In *Energy Resources*, the Supreme Court signaled that section 523(a) should be cabined to its textually specified protections.  Although the Supreme Court recognized the validity of the government's concern that a bankruptcy court's treatment of tax payments as trust fund payments could allow circumvention of section 523(a)'s prohibition on the discharge of certain taxes, the Court nonetheless held that the Bankruptcy Code permitted such treatment

because section 523(a)'s "restrictions do not address the bankruptcy court's ability to designate whether tax payments are to be applied to trust fund or non-trust-fund tax liabilities." 495 U.S. at 550. In line with the Supreme Court's recognition of section 523(a)'s limits, bankruptcy courts have permanently enjoined securities actions against third parties despite section 523(a)(19)'s prohibition on a debtor's release from the same claims. *See, e.g.*, *In re Charter Commc'ns*, No. 09-11435 JMP, 2010 WL 502764, at *5 (Bankr. S.D.N.Y. Feb. 8, 2010).

Section 1123(a), meanwhile, proves the opposite of what Appellants contend. That section grants a court broad authority, "[n]otwithstanding any otherwise applicable nonbankruptcy law," to "provide adequate means for [a] plan's implementation." 11 U.S.C. § 1123(a)(5). "[T]he use of such a 'notwithstanding' clause clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other [law]." *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993); *see also Weinstein v. Islamic Rep. of Iran*, 609 F.3d 43, 53-54 (2d Cir. 2010) ("[T]he Courts of Appeals have regularly interpreted such 'notwithstanding' provisions to supersede all other laws[.]" (internal quotation marks omitted)). Courts therefore have held that section 1123(a) clearly preempts—*i.e.*, applies notwithstanding—state law. *See, e.g.*, *In re Fed.-Mogul Glob. Inc.*, 684 F.3d 355, 374 (3d Cir. 2012) (holding that "plain language [of section 1123] . . . reaches private contracts enforced by state common law, and overcomes the presumption against preemption"); *In re F. Grp., Inc.*, 82 F.3d 159, 165 (7th Cir. 1996) (concluding that section 1123 allowed a reorganization plan to override state corporate law); *Abel v. Shugrue (In re Ionosphere Clubs, Inc.)*, 184 B.R. 648, 654-55 (S.D.N.Y. 1995) (finding "no merit" to argument that plan "improperly extinguished equity ownership interests in violation of state law," because "[s]ection 1123 provides that a plan may impair the interests of any class of claims"); *see*

*also In re Taddeo*, 685 F.2d 24, 28-29 (2d Cir. 1982) ("A state law to the contrary" of an earlier version of section 1123 "must fall before the Bankruptcy Code.").

Notwithstanding its broad language, Appellants claim that section 1123(a)'s preemptive effect does not extend to state police power actions. *See, e.g.*, Wash. Br. 21-22. The smattering of cases they cite demonstrates no such thing. Appellants' primary case, *Pacific Gas & Elec. Co. v. California ex rel. California Department of Toxic Substances Control*, 350 F.3d 932 (9th Cir. 2003), hardly focuses on police powers at all. It instead holds that section 1123(a) preempts only laws related to financial conditions, a conclusion other courts have viewed skeptically. *See, e.g.*, *In re Fed.-Mogul Glob.*, 684 F.3d at 372. Furthermore, those few courts that have discovered a police power exception to section 1123(a)'s preemptive reach have failed to ground their conclusion in the text or structure of section 1123(a). *See, e.g.*, *Montgomery Cty., Md. v. Barwood, Inc.*, 422 B.R. 40, 44-47 (D. Md. 2009); *Irving Tanning Co. v. Me. Superintendent of Ins. (In re Irving Tanning Co.)*, 496 B.R. 644, 664 (B.A.P. 1st Cir. 2013). They have thus ignored the Supreme Court's admonishment that "any understanding of the scope of a pre-emption statute must rest primarily on . . . the language of the pre-emption statute and the 'statutory framework' surrounding it." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485-86 (1996).

> 4.   *No constitutional principle or provision bars non-debtor releases, including of police power claims.*

Lacking any particularized anchor in the Bankruptcy Code for their police power exception for non-debtor releases, Appellants lean heavily on federalism concerns and the Tenth Amendment. *See, e.g.*, Wash. Br. 29-34. But federalism concerns "cannot justify rewriting the Code to avoid federal intrusion." *Davenport*, 495 U.S. at 564.

It would be strange indeed if the Framers intended to fence state police power off from the effect of federal bankruptcy law. As *Central Virginia Community College v. Katz* teaches, one of

federal bankruptcy law's first acts was to supersede state police powers by binding states to a federal bankruptcy court's discharge, and to thereby forbid states from imprisoning debtors as they once had.  *See* 546 U.S. 356, 364 (2006).  Since then, the Supreme Court has continued to view state police power actions as subordinate to federal bankruptcy law.  *See, e.g.*, *Davenport*, 495 U.S. at 564 (upholding "Congress['s] inten[t] to interfere with States' administration of their criminal justice systems"); *Perez v. Campbell*, 402 U.S. 637, 652 (1971) (holding that state law conditioning reinstatement of driver's license on repayment of a tort judgment, despite discharge of debt in bankruptcy, conflicted with fresh start policy of federal bankruptcy law); *see also* 11 U.S.C. § 525 (forbidding states from denying license or permit to person because she has been a debtor).  In fact, section 524(g) allows the release of non-debtor claims—including states' claims—in asbestos-related cases.  *See* 11 U.S.C. § 524(g) (authorizing courts to "enjoin entities" from pursuing certain asbestos-related claims); *id.* § 101(15) (defining "entity" to include "governmental unit").  "Federalism" is therefore anything but a basis for recognizing a police power exception for non-debtor releases.

None of Appellants' other constitutional arguments has merit.  For example, the confirmation of a reorganization plan has nothing in common with the federal statute challenged in *Printz v. United States*, which "unambiguously required the States to enact or administer a federal regulatory program."  *Printz* v. *United States*, 521 U.S. 898, 926 (1997) (discussing *New York v. United States*, 505 U.S. 144 (1992)) *see also* Md. Br. 35-40.  Likewise, by approving the Release, the Bankruptcy Court in no way "assum[ed] the mantle of the prosecutor" by making a discretionary decision for states.  Md. Br. 41.

Appellants' attempt to conceptualize the supposed police power exception in preemption terms misses the mark.  *See, e.g.*, Wash. Br. 17 ("[N]o provision in the Bankruptcy Code or other

federal law allows bankruptcy courts to preempt state police power claims against non-debtors.").
These appeals do not require the Court to delve into preemption doctrines.  For one, the Bankruptcy
Court has not "invalidate[d]" any state law, let alone as a matter of express, conflict, or field
preemption; it has simply released certain police power claims.  *In re Fed.-Mogul Glob.*, 684 F.3d
at 364; *see also Kirwan*, 592 B.R. at 511 ("[I]nvoluntary third-party releases merely extinguish . . .
claims as part of a core bankruptcy process.").  For another, preemption is not a free-flowing
construct for vindicating federalism concerns.  On the contrary, preemption is predicated on federal
supremacy and authority to displace state laws.  In that regard, the Bankruptcy Court's power to
order relief vis-à-vis states is easily traced to the Bankruptcy Clause:

> Congress may, at its option, either treat States in the same way as other creditors
> insofar as concerns 'Laws on the subject of Bankruptcies' or exempt them from
> operation of such laws.  Its power to do so arises from the Bankruptcy Clause itself;
> the relevant 'abrogation' is the one effected in the plan of the Convention, not by
> statute.

*Cent. Va. Cmty. Coll.*, 546 U.S. at 379.  And in case of any remaining doubt, for reasons already
discussed, there is ample textual, statutory, and historical evidence affirmatively demonstrating
Congress's intent to allow the release of third-party claims, police power or otherwise.

To the extent that Appellants argue that the Bankruptcy Clause does not reach the Release
because the "connection" to the *res* of the bankruptcy estate is too "attenuated," Md. Br. 33-34,
*see* UST Br. 31-33, their arguments expressly cross-reference or otherwise collapse into their
misunderstanding of the place of the Releases within the structure of the Plan, discussed above,
and the issue of jurisdiction, discussed next.  *Cf. In re Kirwan*, 592 B.R. at 511 ("As a practical
matter, resolving claims against a debtor will nearly always be integral to resolving a bankruptcy
process, while claims against third parties will be integral only in 'rare cases.'  This is such a case."
(quoting *In re Metromedia*, 416 F.3d at 141)).

C.      **The Bankruptcy Court Has Statutory Jurisdiction And Constitutional Adjudicatory Authority To Approve The Release As Part Of Confirmation**

The Bankruptcy Court correctly held that it had statutory jurisdiction and constitutional adjudicatory authority to approve the Release.

1.      *The third-party claims directly affect the* res *of the estate and therefore have the conceivable effect necessary to establish section 1334 jurisdiction.*

The scope of federal court jurisdiction to hear and determine bankruptcy matters is broad, encompassing "all cases under title 11" and "all civil proceedings arising under title 11, or arising in or related to cases under title 11." 11 U.S.C. § 1334(a)-(b). In the Second Circuit, and virtually all others, section 1334 has been interpreted to provide jurisdiction over a matter if it might have any "conceivable effect" on the bankruptcy estate. *Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.*, 639 F.3d 572, 578-79 (2d Cir. 2011) (internal quotation marks omitted). "If that question is answered affirmatively, the litigation falls within the 'related to' jurisdiction of the bankruptcy court." *In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 114 (2d Cir. 1992). While "related to" jurisdiction is not "limitless," it is "capacious," and can include "suits between third parties." *Celotex Corp. v. Edwards*, 514 U.S. 300, 307 n.5 (1995). An action is sufficiently related "if the outcome could alter the debtor's rights, liabilities, options or freedom of action" or "in any way impacts upon the handling and administration of the bankrupt's estate." *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 339-40 (2d Cir. 2018).

The release of third-party claims against the Sacklers falls comfortably within that "capacious" jurisdiction. *Id.* Bankruptcy jurisdiction extends to "third party non-debtor claims that directly affect the *res* of the bankruptcy estate," *In re Quigley Co.*, 676 F.3d 45, 53 (2d Cir. 2012) (citation omitted), as the Second Circuit repeatedly has explained, *see, e.g.*, *id.*; *SPV Osus*, 882 F.3d at 339-40. The Sacklers and other released parties in these cases arguably have rights to indemnification from the Debtors, and rights to insurance shared with the Debtors. On this basis,

37

and because the released claims "fundamentally overlap[]," and thus potentially compete, with "the estates' own, closely related" claims against the Sacklers and others, the Bankruptcy Court concluded that they "directly affect the *res* of the Debtors' estates." Appx.361; *see also* Appx.389 ("[T]he third-party claims being released … are based on essentially the same facts as the Debtors' veil piercing, alter ego, and breach of fiduciary duty/failure to supervise claims.").

Appellants argue that even if their claims could affect the *res* of the Debtors' estates, the Bankruptcy Court still lacked the power to release them because Appellants say they allege legally independent, non-derivative claims against the non-Debtor defendants. Once again, Appellants position conflicts with clear Second Circuit precedent. In *Quigley*, for example, the Second Circuit held that the bankruptcy court had jurisdiction to enjoin a lawsuit brought by a third-party plaintiff against the debtor's corporate owner. Because the parent's name appeared on some asbestos containing products manufactured by the debtor, the plaintiff claimed that the parent had direct liability for harm caused by exposure to the product under the "apparent manufacturer" doctrine. That doctrine imposes on "one who puts out as his own product a chattel manufactured by another the same liability as though he were its manufacturer." 676 F.3d at 49. The debtor and parent were both covered under insurance policies, the proceeds of which could be used to satisfy claims against the parent, or fund the debtor's reorganization, on a "first billed, first paid" basis. *Id.* at 47.

The parent argued that the plaintiff's suit against it was barred by an injunction in the pending bankruptcy of the debtor, and the bankruptcy court agreed. On appeal, plaintiff argued that the bankruptcy court lacked jurisdiction to enjoin its suit against the non-debtor parent because, among other things, the claims alleged by plaintiff were for violations by parent of "an independent legal duty," not "claims that are 'derivative'" of claims against the debtor. *Id*. at 54.

After a painstaking review of relevant precedents, including the *Manville* line that undergirds Appellants' jurisdictional arguments in these cases, the *Quigley* court disagreed. As it clarified, courts in this Circuit sometimes consider whether a suit is derivative in nature as "a helpful way to assess whether it has the potential to affect the bankruptcy *res*," but "not as an independent jurisdictional requirement." *Id*. at 57. To the extent suits against a third party are "not derivative of the debtor's conduct" but "nevertheless pose[] the specter of direct impact on the *res* of the bankruptcy estate . . . the exercise of bankruptcy jurisdiction to enjoin [such] suits [is] appropriate." *Id*. at 58. The plaintiff's suit presented just such a specter because claims against the parent, if successful, "almost certainly" could deplete insurance proceeds that otherwise would be available to fund the debtor's reorganization. *Id*. The Second Circuit therefore held that the bankruptcy court had jurisdiction to enjoin the parent's suit.

Similarly, here, the released claims could directly affect the *res* of the estates. As the Bankruptcy Court found, those claims would compete with the estates' overlapping claims, and also have the potential to trigger indemnification or contribution liability for the Debtors and to impinge on the proceeds of insurance policies. Appx.361. Focusing on the latter categories of impact, Appellants argue (and the Official Committee does not disagree) that particular released parties might not be able to recover on indemnification and similar claims because of good-faith defenses or otherwise. But for present purposes, Appellants ignore the Bankruptcy Court's separate finding that the released claims also affect the *res* by impacting "the Debtors' ability to pursue the estates' own closely related, indeed fundamentally overlapping, claims." *Id.*

Even setting aside the estates' claims, Appellants' argument misapprehends the "conceivable effect" jurisdictional standard. The "key word . . . is 'conceivable.' Certainty, or even likelihood [of an effect on the estate] is not required." *Winstar Holdings, LLC v. Blackstone*

*Grp. L.P.*, No. 07-cv-4634, 2007 WL 4323003, at *1 n.1 (S.D.N.Y. Dec. 10, 2007) (quoting *In re Dow Corning Corp.*, 86 F.3d 482, 491 (6th Cir. 1996)). Indeed, the Second Circuit has found a "conceivable effect" even where the connection is said to be "illusory" or "improbable." *SPV Osus*, 882 F.3d at 340-42. In previously upholding the preliminary injunction in these Chapter 11 Cases, this Court applied the reasoning of *SPV Osus* to reject an argument that a state statutory bar on indemnification should strip the Bankruptcy Court of jurisdiction. *See In re Purdue Pharms.*, 619 B.R. at 54-55 ("The mere fact that such a dispute is conceivable is enough to confer jurisdiction on the Bankruptcy Court. As the Second Circuit has state[d], '[t]he need for litigation to settle the issue of whether a[n indemnification] . . . claim [against the estate] would be permitted does not militate against finding [such] litigation [is] "related to" the bankruptcy proceeding.'" (alterations and ellipsis in original)); *see also id.* at 53 ("Courts in this Circuit have embraced neither an elevated evidentiary standard nor proof of 'automatic liability' as prerequisites for the bankruptcy court's exercise of 'related to' jurisdiction.").

In short, there can be no serious dispute that the Bankruptcy Court had jurisdiction to release the third-party claims at issue here under established Second Circuit case law. The Bankruptcy Court nevertheless sought to cabin the Release even further. In fact, notwithstanding Appellants' gloss on the Release, the Bankruptcy Court in its Bench Ruling conditioned the approval of the Plan on a further narrowing of the Release, bringing it within the heartland of section 1334 jurisdiction. Incorporating language adopted by the Second Circuit in *Quigley,* the Bankruptcy Court required that the Release apply only to claims "based on or relating to, or in any manner arising from, in whole or in part, (i) the Debtors . . . (ii) the Estates or (iii) the Chapter 11 Cases and (y) as to which any conduct, omission or liability of any Debtor or any Estate is the

legal cause or is otherwise a legally relevant factor."  Appx.249-50 (Plan § 10.7(b)); *see Quigley,*
676 F.3d at 60.

The court also expressly carved out other "Excluded Claims" and "Non-Opioid Excluded
Claims" from the Release.  Appx.249-50 (Plan § 10.7(b)).  These carve-outs ensure that otherwise
released parties shall remain subject to identified types of claims, including (i) criminal claims, (ii)
income tax claims, (iii) claims related to conduct of Sackler entities organized in Canada and not
based upon conduct of the Debtors, (iv) claims against any party arising from such party's conduct
after the Effective Date of the Plan and (v) claims that arise from or relate to *opioid-related* conduct
or allegations made in pending *opioid-related* litigation. The Bankruptcy Court emphasized that
limitation throughout its Bench Ruling.  It noted that the Release would affect "certain claims
against the shareholder released parties based in large measure on the same conduct underlying
certain of the Debtors' claims against the shareholder released parties and the third parties' claims
against the Debtors," Appx.317, but *not* "claims based on the shareholder released parties' conduct
related to non-Debtors," *see, e.g.*, Appx.289 n.3.  Put another way, the Release solely encompasses
third-party claims that are "opioid-related and then only for such claims where Purdue's conduct
is at least in material part a legal element of the third-party claim."  Appx.354, 361; *see also*
Appx.353 ("The third-party claims that the plan would release and enjoin are very closely related
on the facts to the estates' claims for alter ego, veil piercing, and breach of fiduciary duty/failure
to supervise settled under the plan.").  Or said yet a further way, "Debtor's conduct, or a claim
asserted against the Debtor, must be a legal cause of the released claim, or a legally relevant factor
to the third-party cause of action against the shareholder released party, for the third-party claim
to be subject to the release."  Appx.380-81.

In view of the Bankruptcy Court's careful narrowing of the Release, the central premise of the U.S. Trustee's jurisdictional argument—if not its entire appeal—vanishes.   It is not the case that "[t]he Plan dramatically oversteps the bounds of the Bankruptcy Code by terminating non-debtors' claims against the Sackler Family and other non-debtors for their *independent* misconduct, *separate and apart from the misconduct of Purdue*."   UST Br. 24-25 (emphases added).   Such claims would not be subject to the Release, which by its terms requires a specific tie to the misconduct of Purdue—and specifically misconduct related to the opioid claims treated under the Plan, not other misconduct that may be revealed at a later date.   Tellingly, despite repeated questioning by the Bankruptcy Court and this Court, the U.S. Trustee still has not identified a claim against the Sacklers that will be released under the Plan even though it lacks the link to Purdue's opioid conduct that the Bankruptcy Court demanded.   That is because the parties and the Bankruptcy Court crafted the Release to ensure no such claim exists.

2.      *The exercise of jurisdiction was both statutorily and constitutionally "core."*

Appellants separately argue that the Bankruptcy Court (as opposed to this Court) lacked authority to approve the Release because such approvals are not "core" statutory and constitutional proceedings within the meaning of, respectively, 28 U.S.C. § 157(b) and *Stern v. Marshall*, 564 U.S. 462 (2011).   If such a deficiency existed, this Court could cure it simply by treating the Bankruptcy Court's rulings as proposed findings of fact and conclusions of law.   *See* Amended Standing Order of Reference M-431 (S.D.N.Y. 2012).   There is, however, no need to do so because this Court's decision in *Kirwan*—expressly relied upon by the Bankruptcy Court, *see* Appx.366-67—lays out exactly why Appellants are wrong.   As a statutory matter, "[a] bankruptcy court acts pursuant to its core jurisdiction when it considers the involuntary release of claims against a third-party, non-debtor in connection with the confirmation of a proposed plan of reorganization, which

42

is a statutorily-defined core proceeding" wherein the "request for cancellation 'aris[es].'"  592 B.R. at 504-05 (alteration in original) (quoting 28 U.S.C. § 157(b)(1), (2)(L)).  As a constitutional matter, the Release also:  (i) "'stems' from the bankruptcy process" because [it] "derive[s] from . . . bankruptcy law'—[it is] embedded within a confirmed reorganization plan" and "subject to 11 U.S.C. §§ 1129(a)(1), 1123(b)(5) & (6), 105, and 524(e)"; and (ii) is integral to the 'restructuring of debtor-creditor relations'" because it is "necessary to the operation of [Purdue's] reorganization plan."  *Id.* at 509-12 (some alterations and ellipsis in original).

Appellants' principal objection to this reasoning is that it would permit a bankruptcy court to adjudicate essentially any matter as part of plan confirmation.  *See* UST Br. 35; Wash. Br. 38; Cal. Br. 11-12.  But as in *Kirwan*, the "blank check" and "infinite jurisdiction" arguments attack a straw man.  592 B.R. at 505.  Although "[i]t surely would be improper for a bankruptcy court to confirm a plan releasing third-party, non-debtor claims that were unrelated (or even only tangentially related) to the debtor or the bankruptcy case," here the released claims are "sufficiently related to the issues before the bankruptcy court in order for core jurisdiction to cover an order extinguishing th[em]."  *Id.* at 505-06; *see* Part I.C.1, *supra*.  The Bankruptcy Court's narrowing of the Release avoids any need to explore the outer bounds of what constitutes a "core" proceeding. *See* Appx.380-81 (requiring that "Debtor's conduct, or a claim asserted against the Debtor, must be a legal cause of the released claim, or a legally relevant factor to the third-party cause of action against the shareholder released party, for the third-party claim to be subject to the release").

Appellants also peg their analysis to the nature of the claims being released, playing up their state-law and pre-bankruptcy existence.  *See* Md. Br. 14-15; *cf.* US Stmt. 33-34.  That misunderstands the inquiry.  "[A] bankruptcy court's constitutional adjudicatory authority depends, not on the nature of a related claim at issue, but rather on how resolving that claim relates

to a core Article 1 bankruptcy process." *Kirwan*, 592 B.R. at 511.  After all, a particular claim may

be core or non-core, depending on its role in the restructuring process.

*Kirwan* also rejects the view that, because the Bankruptcy Court cannot adjudicate the

claim on its merits, it also cannot order its release.  *See* UST Br. 34.  Those two kinds of rulings

"operate[] on entirely different jurisdictional footing[s]."  592 B.R. at 505.  That is because "[a]

confirmed reorganization plan that includes such releases does not address the merits of the claims

being released; those, of course, are governed by non-bankruptcy law.  Rather, it effectively cancels

those claims so as to permit a total reorganization of the debtor's affairs in a manner available only

in bankruptcy."  *Id.* at 504-05.  Or said in constitutional terms, "[r]ather than constituting an

adjudication of the merits of third-party claims, involuntary third-party releases merely extinguish

those claims as part of a core bankruptcy process, preempting 'an obstacle to the accomplishment

and execution of [an] important federal objective,' *i.e.*, the Bankruptcy Code."  *Id.* (quoting *Geier*

*v. Am. Honda Motor Co.*, 529 U.S. 861, 873 (2000)).  Accordingly, the Bankruptcy Court—as

opposed to this Court—possessed statutory jurisdiction and adjudicatory authority to approve the

Release in the first instance.

### D.     The Bankruptcy Court's Finding That Due Process Was Afforded To Third Parties Is Not Clearly Erroneous

Certain Appellants also challenge the Release under the Due Process Clause.  The Court

should dismiss that challenge out of hand.  The process by which the Bankruptcy Court approved

the Release had all the familiar trappings of due process.

The record evidence supports the Bankruptcy Court's finding—reviewed for clear error—

that "holders of claims received sufficient notice of the proposed release."  Appx.364; *see Elliott*

*v. GM LLC (In re Motors Liquidation Co.)*, 829 F.3d 135, 158-59 (2d Cir. 2016)).

"[U]ncontroverted and credible" testimony detailed the myriad ways in which the Debtors

conducted a "carefully tailored" and "unprecedentedly broad" noticing program that reached "87 percent of all U.S. adults . . . and 82 percent of all Canadian adults"—"including through various types of media aimed especially at people who may have been harmed by the Debtors' products." Appx.255-56, 364-65; *see* Appx.95-109 (J. Finegan Declaration).  "And in fact there were multiple objections to the plan based upon its proposed third-party release."  Appx.364-65.

  The U.S. Trustee contends that creditors could not have made informed decisions because the notice lacked sufficient detail or the Release proved too complicated.  UST Br. 28-30.  But as the fiduciary representing the interests of all unsecured creditors, the Official Committee worked proactively to ensure creditors had the information they needed throughout the Chapter 11 Cases. In its very first exchange with the Official Committee's counsel, the Bankruptcy Court expressed its expectation that "the committee will propose procedures consistent with the relevant Code sections dealing with disclosure and the like, *which are particularly important in this type of case*" where both public and private litigants suffered wide-ranging harm and needed to have their individual voices heard.  Appx.7 ¶ 4 (UCC Information Protocol Motion).  To that end, "and in light of the highly unique circumstances of these chapter 11 cases and the paramount importance of creditor access to information," the Official Committee obtained the Bankruptcy Court's approval to establish a website (www.kccllc.net/PurdueCreditors) for "mak[ing] non-confidential and non-privileged information available and easily accessible to the Debtors' creditors" and "post[ing] information and frequent updates in order to ensure transparency and facilitate open communication with unsecured creditors."  Appx.11-12 ¶ 16.

  In addition, the website "ensure[d] that creditors have access to clear and organized information regarding the status of the Debtors' cases and other critical issues as well as a vehicle to get specific answers to questions and communicate with other parties working to combat the

opioid crisis."  Appx.12-13 ¶ 17.  Prior to confirmation, the Official Committee responded to upwards of 200 personal injury victims who reached out directly, and communicated with approximately 100 other individuals who filed letters on the Bankruptcy Court's docket.  Appx.231 n.14 (UCC Plan Support Letter).  Those figures have only continued to grow (at last count, to 500 personal injury victims who have contacted the Official Committee).

In connection with confirmation, the Official Committee also authored a "Plan Support Letter," directed "[t]o all unsecured creditors," which walked through the Plan's major provisions and the role of the Release.  Appx.223-46.  The Official Committee posted the Letter on its website and also insisted that the Letter be included in Plan solicitation materials:

> [P]articularly in light of the unique nature of these cases and the significant role the Official Committee has played, the Official Committee believes that all creditors must be given the opportunity to understand the Official Committee's perspective in order for such creditors to be in a position to make an informed determination as to whether to support the Plan.  Moreover, many—if not most—of the creditors whose votes will be solicited in connection with the Plan are not traditional financial creditors accustomed to analyzing the terms of a transaction through the lens of a disclosure statement and voluminous related materials, nor do many such parties have their own counsel.  These creditors will benefit from the perspective of the sole creditor-only fiduciary in these cases, particularly in light of the Official Committee's significant and far-reaching role.  The Official Committee therefore submits that the Official Committee Letter will not only be informative to creditors, but also essential to their ability to understand the terms of the Plan and why it is structured the way it is.

Appx.51-52 ¶ 7 (UCC Statement on Disclosure and Solicitation Motion) (footnote omitted).  The Bankruptcy Court readily agreed.  *See* Appx.898-900, at 21:19-23:2 (June 2, 2021 Hr'g Tr.) (providing reasons why Letter is appropriate and must be made readily accessible).

Thereafter, the Bankruptcy Court recounted in its Bench Ruling that "the most widespread notices of the plan's proposed third-party release were simple, in plain English that the plan contemplated a broad release of the Sacklers and their related entities of civil claims pertaining to the Debtors, including claims against them held by third parties," Appx.257 (citing Appx.104-07

¶¶ 19-22)—notices that the U.S. Trustee (ironically) believes should have been more complicated, UST Br. 28-29. The foregoing—most of which the U.S. Trustee overlooks—is more than a sufficient record basis to uphold the Bankruptcy Court's finding that "notice was reasonably calculated under the circumstances to apprise interested parties of the pendency of the plan's proposed release and afford them an opportunity to present their objections." Appx.364 (citing *Mullane v. Cent. Hanover Bank & Trust Co.*, 330 U.S. 306, 314 (1950)).

Besides the adequacy of the notice, the U.S. Trustee argues that due process required creditors to be compensated in exchange for the Release. UST Br. 30-31. That argument fails twice over. Factually, the entire point of the Release is that the Sacklers *are* compensating victims. If otherwise, it defies common sense to believe that the Official Committee would have negotiated the Release and ultimately supported the Plan. Although the U.S. Trustee complains that such "compensation will be paid based on only claims against Purdue," UST Br. 30, that is an unexceptional aspect of non-debtor releases. The Release as approved extends only to claims for the Sacklers' conduct in connection with the Debtors, *i.e.*, the same conduct that gave rise to the underlying claims against the Debtors. And the purpose of the Release is to bring $4.325 billion and other non-monetary consideration *from the Sacklers* into the estates, thereby creating the necessary value that permits the Debtors to provide relief to claimants under the Plan for the harm caused to them by the Sacklers. What makes that permissible as a substantive, jurisdictional, and procedural matter is the fundamental overlap between the third-party claims and the claims against the Debtors, which has a potentially direct effect on the *res* of the estates. It is not happenstance. *Contra id.* (stating that claim is released "if the victim also happens to hold a claim against Purdue"). Using the value provided by the Sacklers to pay bankruptcy claims thus fits perfectly with the established legal framework governing non-debtor releases. Compensation is not

provided for "independent causes of action against the Sackler Family and other non-debtors," *id.* at 31, because "independent" claims are not being released.

Legally, the U.S. Trustee cites not one case for the proposition that procedural due process dictates a certain form or amount of compensation.  "While [parties] may express[] their dissatisfaction with the outcome of their interactions with [other parties], . . . procedural due process guarantees only a process, not a specific outcome."  *Patrick v. Success Acad. Charter Schs., Inc.*, 354 F. Supp. 3d 185, 203 (S.D.N.Y. 2018) (second alteration and ellipsis in original) (internal quotation marks omitted).  To the extent the U.S. Trustee's reference to "property taken without consent" suggests a connection to the Takings Clause, UST Br. 31, that separate constitutional provision contains an express "just compensation" requirement, U.S. Const. amend. V.

Finally, the U.S. Trustee asserts that released parties must have their "day in court," with an unfettered due process right to refuse the Release.  UST Br. 26-28.  In particular, the U.S. Trustee spills much ink discussing due process limitations for consent decrees and class action settlements, and proclaims that the same principles are equally true of bankruptcies.  Yet the Supreme Court has long made clear—as reiterated in several of the precedents the U.S. Trustee relies upon—that "where a special remedial scheme exists expressly foreclosing successive litigation by nonlitigants, *as for example in bankruptcy* . . . , legal proceedings may terminate pre-existing rights if the scheme is otherwise consistent with due process."  *Martin v. Wilks*, 490 U.S. 755, 762 n.2 (1989) (emphasis added); *see Taylor v. Sturgell*, 553 U.S. 880, 895 (2008); *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 846 (1999); *see also Richards v. Jefferson Cty.*, 517 U.S. 793, 798-99 (1996) (citing *Martin* as example in which due process "principles do not always require one to have been a party to a judgment in order to be bound by it").  Once again, counterarguments are premised on

48

a misunderstanding of the nature of the claims subject to the Release.  *See Johns-Manville Corp.*

*v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.)*, 600 F.3d 135, 151-54 (2d Cir. 2010) (per

curiam) (explaining that due process was not afforded, and bankruptcy court actually was

proceeding *in personam*, only after parsing non-debtor claims against third parties as improperly

released).

## II.    THE PLAN IS IN THE BEST INTERESTS OF CREDITORS REGARDLESS OF THE LEGAL TEST APPLIED

Trying another approach, the state Appellants also tack on an argument that the Plan fails

to satisfy the so-called "best interests" test. Wash. Br. 39-48.  Bankruptcy Code section 1129(a)(7),

from which the test derives, requires that an impaired creditor entitled to vote on a plan "receive

or retain under the plan on account of such claim or interest property of a value, as of the effective

date of the plan, that is not less than the amount that such holder would so receive or retain if the

debtor were liquidated under chapter 7" of the Bankruptcy Code.  11 U.S.C. § 1129(a)(7).  The

Bankruptcy Court followed section 1129(a)(7) to the letter, finding that the value each creditor will

receive or retain "on account of its claim" under the Plan exceeded the value it would "so receive

or retain" (*i.e.*, on account of the same claim) in a hypothetical chapter 7 liquidation.  That finding

was eminently reasonable—and certainly not clear error, *see Kane v. Johns-Manville Corp.*, 843

F.2d 636, 649 (2d Cir. 1988).

The state Appellants read section 1129(a)(7) to require a bankruptcy court confirming a

plan containing non-debtor releases also to consider, *as part of* the amount a creditor would "so

receive or retain" in a hypothetical chapter 7 liquidation, the potential value of the third-party

claims subject to a release. The Bankruptcy Court's explication for why that reasoning is wrong—

in essence, that section 1129(a)(7) sets up an apple-to-apple comparison regarding the recovery a

creditor would receive "on account of" the same bankruptcy "claim," as reflected by the word "*so*

receive or retain," Appx.394-96—is sound.  In any case, the Bankruptcy Court also indulged the objecting parties by engaging in a "best interests" analysis that included the value of the released third-party claims, and found that, even including this additional value, the objectors' recovery "would be materially less" in a hypothetical Chapter 7 liquidation "than their recovery under the plan."  Appx.396.

There can be little dispute that absent the allocation settlements contained in the Plan, there would be fierce and costly infighting among creditors.  Citing record evidence in the form of a "section 1129(a)(7) 'best interests' liquidation analysis," the Bankruptcy Court explained that "[u]nder the most realistic scenarios described in that analysis, there would literally be *no* recovery by unsecured creditors from the estates in a Chapter 7 liquidation."  Appx.340.  That was "the most likely result if the settlements with the shareholder released parties were not approved, given the likely unraveling of the heavily negotiated and intricately woven compromises in the plan and the ensuing litigation chaos."  *Id.*

Significantly, by distributing value to the States, the Plan also satisfied a condition of the Debtors' earlier settlement with the U.S. Department of Justice that the Bankruptcy Court had previously approved, and thereby avoided the diminution of the Debtors' estates by $2.0 billion in respect of the federal government's "allowed superpriority administrative expense claim" that would have been entitled to take value ahead of all other creditors.  *See* Appx.43-44 ¶ 3 (order approving and authorizing Debtor settlements with DOJ).  In light of that alternative "'battle of the century' among the creditor parties" for $2 billion *less* in estate value, the Bankruptcy Court found that the Plan satisfied section 1129(a)(7) even "under a broad construction of th[e] [best interests] test."  Appx.399.

At a minimum, the Bankruptcy Court's "account of the evidence is plausible in light of the record viewed in its entirety." *O'Rourke v. United States*, 587 F.3d 537, 540 (2d Cir. 2009) (describing clearly erroneous standard). Indeed, it was the reality of these Chapter 11 Cases during the first foray into intercreditor litigation, when no fewer than 10 parties filed voluminous briefs on a preliminary procedural question. *See* Appx.157-58 ¶ 5 & n.10 (UCC Statement). In order to avoid a descent into such wasteful and value-destructive infighting, the Official Committee intervened in those early proceedings, requested that the Bankruptcy Court defer ruling to allow time for mediation, took a leading role in negotiating the global deal embodied in the intercreditor agreements, and ultimately supported the Plan because "[w]hen these agreements were reached, it was well understood (as it remains today) that the only alternative path forward would be a time-consuming, costly *bellum omnia contra omnes* over the gating issue of relative entitlement" of creditors. Appx.157-58 ¶ 5; *see* Appx.229-31, 238-39 (UCC Support Letter) (summarizing "Phase I Mediation" and "Phase II Mediation"). In addition, the Appellants ignore the fact that if the Plan is overturned and the parties return to all-out litigation, the federal government and state Appellants may be subject to substantial liability for receiving the proceeds of fraudulent or otherwise voidable transfers from the Debtors on account of the Sacklers' tax liabilities. Indeed, the record showed that the federal government and the state of Connecticut, in particular, received approximately $4.06 billion and $285 million, respectively, in transfers from the Debtors that may be subject to avoidance. Appx.218-19 ¶ 28 (M. Atkinson Declaration).

The state Appellants remain dissatisfied, arguing that the Bankruptcy Court required "no specific evidence" to support the liquidation analysis. Wash. Br. 40. But what the Bankruptcy Court actually held was that "no . . . *expert* testimony" was necessary "given the evidence regarding [i] the strengths and weaknesses of the [objectors'] claims, including the cost of pursuing

them, [ii] the risks of collection, and [iii] the dilutive effect of all the other litigation that would be pursued by all of the other creditors in these cases, including all of the other states and governmental entities who are otherwise agreeing to the plan that would have the same types of third-party claims, as well as the Chapter 7 trustee on behalf of the estate."  Appx.397 (emphasis added).

The extensive evidentiary record is more than enough to sustain that factual determination, especially under the highly deferential standard of review.   Notably, the Bankruptcy Court expressly cross-referenced its lengthy discussion of the evidence establishing the fairness of the settlement of third-party claims under *Motorola, Inc. v. Official Committee of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007), in terms of collectability and the legal risks posed by continued litigation.  *See* Appx.335-51 (citing testimony of several witnesses); *see also* Appx.399 ("Accordingly, for the same reasons that that the plan's settlement/third-party claims release of the shareholder released parties is fair to the objectors, the plan also meets Bankruptcy Code section 1129(a)(7)'s 'best interests' test under a broad construction of that test."). Its measured *Iridium* reasoning is incontrovertible:

> I believe that in a vacuum the ultimate judgments that could be achieved on the estates' claims (and the closely related third-party claims that are being settled under the plan) might well be higher than the amount that the Sacklers are contributing.  But I do not believe that recoveries on such judgments would be higher after taking into account the catastrophic effect on recoveries that would result from pursuing those claims and unravelling the plan's intricate settlements. And as I said at the beginning of this analysis, there is also the serious issue of problems that would be faced in collection that the plan settlements materially reduce.

Appx.349.

Notably, among thousands of creditors that weighed their options in these cases—including other states and governmental entities—Appellants stand alone in challenging the confirmed Plan.

Yet "extremely well-represented and dedicated parties on the prospective plaintiffs' side, knowing far more than [the Bankruptcy Court] laid out . . . about the strengths and weaknesses of the claims, costs, delay, and collection issues, agreed to th[e] settlement." Appx.351. That includes the Official Committee's independent and painstaking investigation of the Sackler claims, which informed the Official Committee's participation in various negotiations and its ultimate view that "the Plan represent[s] the only viable conclusion to the Chapter 11 Cases." Appx.242-46 (UCC Plan Support Letter). The alternative, in which those plaintiffs would seek recoveries from the Sacklers on their own third-party claims, would significantly dilute the value that could be recovered from the Sacklers both by the estates and by Appellants. *See* Appx.397 (noting "dilutive effect of all the other litigation" on the value of released claims).

Although the state Appellants speculate that there are reasons for why their claims against the Sacklers would lead to recovery when other such claims may fail, *see* Wash. Br. 44-47, the alleged advantages are illusory in their own right—and even weaker when measured against the entire litigation landscape. For example, the state Appellants argue that because they are states, they are entitled to various advantages over other creditors (*i.e.*, exemption from federal court jurisdiction, lower burdens of proof, longer statutes of limitation) in any hypothetical litigation. But the same would be true of all 48 states and various other quasi-sovereigns that filed proofs of claims in these cases aggregating at least $2.156 trillion ($450 billion for the objectors alone). Appx.391-92. A chapter 7 trustee, moreover, could seek an injunction to protect its ability to pursue estate claims before others. *See, e.g.*, *Fisher v. Apostolou (In re Lake States Commodities, Inc.)*, 155 F.3d 876, 882 (7th Cir. 1998) (discussing ability of chapter 7 trustee to "temporarily block adjudication of claims that are not property of the estate by petitioning the bankruptcy court to enjoin the other litigation, if it is sufficiently 'related to' her own work on behalf of the estate").

All of these creditors would be seeking recovery from the Sacklers' $11 billion net worth, and "[t]hey would never permit the objecting states, which are similarly situated to them, to win a litigation race."  Appx.334, 393.

The related supposition that states' claims against the Sacklers would be nondischargeable and produce a recovery if "extensive litigation forced the Sacklers into bankruptcy," Wash. Br. 44, requires layers upon layers of speculation.  Even the courts that have considered the value of third-party claims under the "best interests" test have made clear that such a comparison is possible only if that value is "neither speculative nor incapable of estimation."  *In re Quigley Co.*, 437 B.R. 102, 145 (Bankr. S.D.N.Y. 2010); *In re Ditech Holding Corp.*, 606 B.R. 544, 615 (Bankr. S.D.N.Y. 2019).  At any rate, nondischargeability does not distinguish the state Appellants from a hypothetical chapter 7 trustee or other creditors, including private creditors, that hold claims against the Sacklers for fraudulent transfers or the like.  *See, e.g.*, 11 U.S.C. § 523(a)(2)(A).  Even more fundamentally, any exception from discharge simply does not apply to defendants not eligible to commence bankruptcy proceedings in the United States, which may necessarily exclude from this analysis a large number of foreign trusts and entities associated with the Sacklers.  11 U.S.C. § 523(a).  Accordingly, regardless of the legal test applied, there is no cause to second-guess the Bankruptcy Court's record-based finding that the state Appellants would be worse off in a hypothetical chapter 7 litigation based on their optimism regarding how they would fare on their released claims against the Sacklers.

## CONCLUSION

This Court should affirm the Bankruptcy Court's Confirmation Order.


Dated: November 15, 2021
　　　　New York, New York　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　*/s/  Mitchell Hurley*
　　　　　　　　　　　　　　　　　　　Arik Preis
　　　　　　　　　　　　　　　　　　　(apreis@akingump.com)
　　　　　　　　　　　　　　　　　　　Mitchell P. Hurley
　　　　　　　　　　　　　　　　　　　(mhurley@akingump.com)
　　　　　　　　　　　　　　　　　　　Sara L. Brauner
　　　　　　　　　　　　　　　　　　　(sbrauner@akingump.com)
　　　　　　　　　　　　　　　　　　　AKIN GUMP STRAUSS HAUER & FELD LLP
　　　　　　　　　　　　　　　　　　　One Bryant Park
　　　　　　　　　　　　　　　　　　　New York, N.Y. 10036-6745
　　　　　　　　　　　　　　　　　　　Telephone:  (212) 872-1000
　　　　　　　　　　　　　　　　　　　Facsimile:  (212) 872-1002

　　　　　　　　　　　　　　　　　　　Z.W. Julius Chen (admitted *pro hac vice*)
　　　　　　　　　　　　　　　　　　　(chenj@akingump.com)
　　　　　　　　　　　　　　　　　　　AKIN GUMP STRAUSS HAUER & FELD LLP
　　　　　　　　　　　　　　　　　　　2001 K Street, N.W.
　　　　　　　　　　　　　　　　　　　Washington, D.C. 20006
　　　　　　　　　　　　　　　　　　　Telephone:  (202) 887-4000
　　　　　　　　　　　　　　　　　　　Facsimile:  (202) 887-4288

　　　　　　　　　　　　　　　　　　　*Counsel for The Official Committee of Unsecured*
　　　　　　　　　　　　　　　　　　　*Creditors of Purdue Pharma L.P., et al.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Bankruptcy Procedure 8015(h), the undersigned certifies that the above brief complies with the typeface requirements of Federal Rule of Bankruptcy Procedure 8015(a)(5) and type-style requirements of Federal Rule of Bankruptcy Procedure 8015(a)(6), as modified by the May 21, 2021 Individual Practices and Procedures—Chief Judge Colleen McMahon § V(E), because this memorandum has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman 12-point font.  The Court has waived the type-volume limitations of Federal Rule of Bankruptcy Procedure 8015(a)(7)(B) for this brief, *see* Oct. 12, 2021 Hr'g Tr. at 19, which contains 17,466 words.

*/s/ Mitchell P. Hurley*
Mitchell P. Hurley

**CERTIFICATE OF SERVICE**

I hereby certify that on November 15 2021, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Southern District of New York by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Further, in compliance with the Court's Standing Order dated November 25, 2009, and the May 21, 2021 Individual Practices and Procedures—Chief Judge Colleen McMahon § V(A), I have caused courtesy copies, marked as such, to be sent via messenger to:

> The Honorable Colleen McMahon
> Chief Judge
> United States District Court for the
>   Southern District of New York
> Daniel Patrick Moynihan United States
>   Courthouse
> 500 Pearl Street, Room 2550
> New York, NY 10007-1312

> */s/ Mitchell P. Hurley*
> Mitchell P. Hurley